Morris Schapiro and Rebecca Schapiro v. Commissioner.
Schapiro v. Commissioner
Docket No. 5983-65.
United States Tax Court
T.C. Memo 1968-44; 1968 Tax Ct. Memo LEXIS 254; 27 T.C.M. (CCH) 205; T.C.M. (RIA) 68044; March 15, 1968. Filed Irving Shulbank, Garrett Bldg., Redwood & South Sts., Baltimore, Md., for the petitioners. Francis J. Cantrel and Thomas C. Morrison, for the respondent. MURDOCK Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in income tax of the petitioners as follows: $616.95 for 1957; $2,580.73 for 1958; $7,813.33 for 1959; and $13,827.97 for 1960. The issues for *255 decision are: (1) whether amounts received in each year from American Machine and Foundry Company were longterm capital gain as reported or were ordinary income as determined by the Commissioner; (2) whether interests paid on borrowed money in 1959 and 1960 was non-deductible because the money borrowed was used to buy interest-free bonds within the meaning of section 265(2), I.R.C. 1954; (3) whether the fair market value of a Rembrandt Peale portrait of George Washington given in 1960 to Peabody Institute, a charitable organization, was $15,000 as claimed on the return or was $13,000 as determined by the Commissioner; and (4) whether the fair market value of a one-third interest in a property at 907 Druid Park Lake Drive in Baltimore given to Peabody Institute in December 1960 was $26,470 as claimed on the return or was $22,000 as determined by the Commissioner. Two depreciation items have been stipulated. Findings of Fact The petitioners, Morris and Rebecca Schapiro, husband and wife, now reside in Ellicott City, Maryland. They filed joint Federal income tax returns for the years 1957 through 1960 with the director of internal revenue for the district of *256 Baltimore, Maryland. Morris acquired 500 shares of Automatic Pinsetter Co., Inc. stock prior to January 1, 1954 and held them on September 16, 1954 when a partial liquidation of the company (herein called Pinsetter) was made. Joseph C. Clark was the largest single stockholder of that company and he was also an officer and director. He had previously developed a fully automatic pinsetter to clear away bowling pins knocked down by a bowling ball, reset the other pins as required by the rules of the game and return the bowling ball to the bowler. Clark transferred this device to Pinsetter. American Machine and Foundry Company (AMF), Brunswick Balke Collender Co. (Brunswick) and others had been trying, independently, to develop a satisfactory automatic pinsetter. AMF and Brunswick made offers to acquire Pinsetter's patents, patent applications, tools, drawings, working models and other assets, except cash, which offers Pinsetter considered. Pinsetter accepted the AMF offer on November 7, 1946 and received from AMF $200,000, 25,000 AMF shares and the right to receive 1% of all AMF income through 1966 from the sale or lease of automatic pinsetter machines, less its expense of maintaining *257 the leased machines. Pinsetter had 75,000 shares outstanding and it distributed to its stockholders $1 and 1/3 AMF share per Pinsetter share in partial liquidation prior to the end of February 1947. The first fully automatic pinsetter to be commercially installed in the world was placed in operation by AMF in Mt. Clemens, Michigan in the summer of 1951 where twelve machines were leased. AMF had earlier installed demonstration machines referred to as the Faith Hotel Operation, which undertaking was operated by AMF. In order that a bowler's score may make him eligible for competition in major tournaments it is required that his scores be achieved on bowling alleys (also known as lanes) certified by the American Bowling Congress (ABC) to be of acceptable size and acceptable physical condition. ABC gave formal approval of the AMF pinsetter machine as being acceptable for ABC sanctioned league and tournament play on April 26, 1952. This approval was also adopted by the Women's International Bowling Congress. The 1% of AMF income due Pinsetter was paid on the 31st of January and July in each year. The first payment was of 207 $89.18 made on January 31, 1952. The payment made *258 on July 31, 1954 was of $9,492.29 and the total payments up to that time amounted to $17,769.60 or $.23691 per Pinsetter share. The total payments of the 1% through 1962 amounted to $5,763,876.01 or $76.85168 per Pinsetter share. The Pinsetter directors adopted a resolution on July 15, 1954 to liquidate the company and to designate Camden Trust Co. (Camden) trustee to receive and distribute to the [stockholders'] funds subsequently received. The Pinsetter stockholders voted on September 16, 1954 to dissolve the company, to distribute to Camden the contract requiring AMF to pay the 1%, to deliver their 75,000 Pinsetter stock shares to Camden in exchange for proportionate fractional participation certificates in the trust funds and to have the remaining assets of Pinsetter after dissolution distributed pro rata among the former stockholders. A certificate of dissolution of Pinsetter was issued on October 5, 1954 and a final distribution of 4 1/2 cents per share was made in cash on November 5, 1955. There was no competing automatic pinsetter on the market for sale or lease on July 15, 1954 or September 16, 1954. The number of alleys or lanes certified by ABC at July 31, 1954 and *259 at July 31, 1964 was as follows: July 31, 1954
July 31, 1964
United States
57,243
158,996
Foreign
1,739
6,037
Total
58,982
165,033
The number of certified establishments on the aforesaid dates was as follows: July 31, 1954
July 31, 1964
United States
6,678
10,839
Foreign
233
614
Total
6,911
11,453
Brunswick did not place a competing fully automatic pinsetter in commercial operation under lease or sale until April 10, 1956 when its competing fully automatic pinsetter was exhibited at Roselle Park, New Jersey. All Pinsetter shareholders owning stock at the time of the contract dated February 4, 1947 with AMF recovered their basis in their stock holdings as a result of the distribution of $1 and 1/3 share of AMF stock made by the company in 1946 and 1947. AMF purchased 945 shares of Pinsetter stock for $1,405 between September 2, 1948 and February 1, 1951. The petitioners reported as capital gain, on the 500 shares of Pinsetter stock formerly owned by Morris, the amounts received from Camden in each of the four tax years. The Commissioner in determining the deficiencies treated those amounts as ordinary *260 income. Morris borrowed money from Mercantile Safe Deposit and Trust Company of Baltimore (Mercantile) and used some of that money to buy bonds, the interest on which was subject to Federal income tax. The balance due on those loans on January 1, 1959 was $575,549.87 secured by collateral. Morris sold some stock in February and March 1959 and on March 25, 1959 applied $550,000 of the proceeds to reduce his loan at Mercantile to $25,549.87. He borrowed $250,000 from Mercantile on July 15, 1959 and on that same day withdrew $200,561.11 of the Mercantile loan to purchase $200,000 face value of State Roads Commission of Maryland State Highway Construction 4% bonds due July 1, 1974, the interest on which is exempt from income tax by section 103(a), I.R.C. 1954. Morris did not withdraw the collateral on his earlier borrowings and Mercantile marked the July 15, 1959 loan of $250,000 as "secured by collateral pledge on 3-15-55 loan." The tax free bonds were not used by Morris as collateral to secure the July 15, 1959 loan. The petitioners claimed deductions of $4,366.38 for 1959 and $9,848.60 for 1960 on their returns representing interest paid to Mercantile allocable *261 to the $200,561.11 used to buy the tax free bonds. The Commissioner in determining the deficiencies disallowed those deductions, citing section 265 (2), I.R.C. 1954. The petitioners in December 1960 contributed a Rembrandt Peale portrait of George Washington to Peabody Institute of Baltimore, Maryland, a charitable corporation within section 170(b)(1)(A), I.R.C. 1954. William F. Davidson, an experienced expert in the field of early American art and an officer of M. Knoedler and Co. of New York, examined the portrait and appraised it for Morris at $15,000. The petitioners claimed that amount on their 1960 income tax return as a contribution. The Commissioner in determining the 1960 deficiency allowed a deduction of $13,000 for that contribution. The fair market value of the portrait at the time of the gift to Peabody was $15,000. The petitioners purchased a "mansion" type home at 907 Druid Park Lake Drive, 208 Baltimore, Maryland, for $125,000 in 1923. It had been built in 1907. The petitioners lived there until some time in 1959 or 1960 and during that time they spent between $30,000 and $40,000 to improve the property. The *262 petitioners decided in 1960 to donate the property to Peabody Institute and, in order to gain the greatest allowable income tax benefits from the resulting charitable contributions, they spread the gift over three years. At some time prior to December 28, 1960, Morris requested Bandiere Inc., Realtors (Bandiere) to value the improved real property owned by the petitioners which was located at 907 Druid Park Lake Drive, Baltimore, Maryland (907). Bandiere informed Morris by letter dated December 28, 1960, with an attached detailed appraisal report, that on the reproduction cost method of evaluation, it was Bandiere's opinion that the value of petitioners' property was $79,410 as of December 15, 1960. Petitioners deeded an undivided one-third (1/3) interest in 907 in fee to Peabody by deed, dated December 2, 1960 and recorded December 19, 1960. The petitioners claimed a charitable deduction on their 1960 joint return in the amount of $26,470 for the one-third undivided interest in 907 given to Peabody. The Commissioner in determining the 1960 deficiency allowed a deduction of $22,000 for this contribution. On January 5, 1961, petitioners deeded an additional undivided one-third *263 (1/3) interest in 907 in fee to Peabody. On January 18, 1962, petitioners deeded their remaining undivided one-third interest in 907 in fee to Peabody. On January 5, 1961, and in conjunction with the deed of January 5, 1961 to Peabody, petitioners deeded their remaining undivided one-third interest in 907 to Mercantile pursuant to the terms of a revocable trust. Peabody obtained the services of Mercantile for the management of their interest in 907. Petitioners revoked the above-mentioned trust instrument on January 18, 1962 in order to effect the final gift in 907 to Peabody. All stipulated facts and exhibits are incorporated herein by this reference. Opinion MURDOCK, Judge: The first question argued before the Court is whether the remaining right to receive the 1% profit payments from September 16, 1954 through 1962 had any ascertainable fair market value on September 16, 1954. If the right had such value, the company's liquidation became a "closed" transaction, as determined by the Commissioner. If it did not, the company's liquidation remained an "open" transaction, as maintained by the petitioners. In the latter instance, all of Morris' receipts from the aforesaid contract *264 right are long term capital gains for the taxable years in issue, i.e., 1957 to 1960, inclusive. If the right had an ascertainable fair market value on September 16, 1954 Morris' receipts upon the aforesaid contract right are not gains from the sale or exchange of a capital asset but for the taxable years in issue are characterized as, first, a return of Morris' basis in the aforesaid contract right, i.e., the ascertainable fair market value on September 16, 1954 to the extent not reduced by contract right payments received by Morris from September 16, 1954 to December 31, 1956, and second, to the extent of the excess, if any, ordinary income. The automatic pinsetter involved in these cases was unique, the first to come on the market. It started and, by 1962, had brought about an extraordinary change in bowling, increasing its popularity many times. However, it was not apparent on September 16, 1954 how successful AMF would be in developing, leasing, selling and maintaining its automatic pinsetter. There was some justification at that time to believe or to hope that AMF would in time be able to manufacture and lease a substantial number of this new invention. But there was nothing *265 with which to compare it and no sound basis on which to estimate how long its development would take, how much AMF's profits would be during the years 1954 through 1966, or how much would be received during that period on the 1% interest involved herein. There was on September 16, 1954 no real or fair market value for those interests. A preponderance of the evidence in these cases supports the taxpayers' contention that no real fair market value for those interests was actually ascertainable on that date and justifies their failure to report, as of September 16, 1954, or any later date, capital gain from any ascertainable fair market value of those interests. The evidence of "offers" and sales and the cases relied upon by the Commissioner are not comparable or helpful. The "offers" were mere talk and far from actual sales. 209 The sales were at unrelated times, were of quite different subject matter, were unusual and atypical. Motion pictures, oil and gas and other subjects involved in determinations of fair market values in cited cases had histories and helpful parallels which are absent here. Likewise March 1, 1913 values and other necessary valuations, as for estate tax, *266 are not in point here where there is no necessity to determine a fair market value. The best solution in the present cases is to allow the 1% amounts actually received in later years by the petitioners to be reported and taxed as part of their long-term capital gains from the liquidation of their shares of Automatic Pinsetter Co., Inc. stock. Stephen H. Dorsey, et al., 49 T.C. 606. The interest on borrowed money was properly disallowed as deductions for 1959 and 1960 since the indebtedness was "incurred or continued to purchase or carry obligations * * * the interest on which is wholly exempt from the taxes imposed by this subtitle" within the meaning of section 265(2), I.R.C. 1954. Bernard H. Jacobson [Dec. 22,412], 28 T.C. 579; F. W. Dryborough, 42 T.C. 1029; Constance M. Bishop, 41 T.C. 154; affd. 342 F. 2d 757. The petitioners had owned the Rembrandt Peale portrait of George Washington for a number of years and, when they decided to give it to Peabody Institute, they had William F. Davidson, an official of M. Knoedler & Co. of New York who is an experienced expert in the field *267 of early American art, come to Baltimore late in 1960 to advise them as to the fair market value of the portrait. Davidson advised that it had a fair market value of $15,000 and the petitioners claimed a charitable deduction in that amount on their 1960 return. The record contains no other opinion as to the fair market value of the portrait at any period of time. The Commissioner, in determining the 1960 deficiency, allowed a deduction of only $13,000. He argues that the best evidence in this record of the fair market value of the portrait in December 1960 is the sale of the portrait by M. Knoedler & Co. for $13,000 in 1962. Davidson arranged that sale and explained the reduction in price at that later date. The fair market value of the Rembrandt Peale portrait of George Washington was $15,000 at the time in December 1960 when the petitioners gave it to Peabody Institute, a charitable organization in Baltimore. In issue here is the fair market value of the one-third undivided share in 907 transferred in December 1960. The petitioners had an experienced real estate appraiser examine the property in 1960 and he testified that the fair market value of the property in December 1960 *268 based upon reproduction cost was $79,410. The petitioners deducted one-third of that amount or $26,470 as a charitable deduction on their 1960 return. The Commissioner, in determining the deficiency, allowed a deduction of $22,000. There is no evidence of whether or not the property was ever used as a residence or otherwise after the Schapiros vacated it. The property had not been sold up to the time of trial in this case although efforts were made to sell it. The cost of reporoduction is not helpful in the absence of salability. It is not shown in theerecord that the property was salable for a single family residence in or after 1960. The evidence as a whole leaves doubt as to the type of usefulness and value of the property at times material hereto. The petitioners have failed to sustain their burden of proof to show that the fair market value of the one-third interest transferred in 1960 was in excess of the $22,000 allowed by the Commissioner as a deduction in determining the deficiencies for 1960. Decision will be entered under Rule 50.