BERNARD H. AND BLANCHE E. JACOBSON, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 59219. Filed May 31, 1957.

*Edgar J. Goodrich, Esq.*, for the petitioners.
*Lyman G. Friedman, Esq.*, for the respondent.

MULRONEY, *Judge:* Respondent determined a deficiency in petitioners' income tax for the year 1952 in the amount of $18,097.85. Certain adjustments made by the respondent are not contested by the petitioners. Respondent disallowed a deduction of $25,777.75, claimed by the petitioners for interest paid on certain bank loans, on the ground that such indebtedness was incurred to purchase tax-exempt obligations within the meaning of section 23 (b) of the 1939 Internal Revenue Code.[1] The correctness of this disallowance is the sole issue in this case.

---

[1] All references to section numbers will refer to the 1939 Internal Revenue Code unless otherwise noted.

FINDINGS OF FACT.

Petitioners, Bernard H. and Blanche E. Jacobson, husband and wife, reside in Dunbar, West Virginia. They filed a joint Federal income tax return for 1952 with the district director of internal revenue at Parkersburg, West Virginia. Petitioners' return was filed on the cash receipts and disbursements method.

Bernard has been engaged for many years in the chemical business. In April 1936, he acquired control of Ohio-Apex, Inc., a bankrupt chemical manufacturing company, and he served as president of Ohio-Apex, Inc., from 1936 to 1951, when the corporation was merged with the Food Machinery and Chemical Corporation in a transaction in which the petitioners exchanged all their common stock of Ohio-Apex, Inc., for 44,000 shares of the common stock of Food Machinery and Chemical Corporation. Bernard has been an executive of Food Machinery and Chemical Corporation since the merger in 1951.

Blanche has been the owner and operator of a retail ladies' apparel shop in Charleston, West Virginia, for many years. Both Bernard and Blanche have obtained loans over the years from various banks, and, beginning late in 1951, they used their stock in the Food Machinery and Chemical Corporation to establish a line of bank credit.

On December 15, 1951, Bernard borrowed $400,000 from the Kanawha Valley Bank against collateral of 15,000 shares of Food Machinery and Chemical Corporation common stock, and on the same date he purchased $400,000-par-value 2½ per cent West Virginia Veterans Bonus Bonds for $400,642.52. Interest from these bonds was wholly exempt from Federal income tax. This loan was repaid as follows:

| | |
|---|---:|
| May 9, 1952 | $50, 000 |
| Aug. 29, 1952 | 20, 000 |
| Oct. 1, 1952 | 10, 000 |
| Oct. 28, 1952 | 120, 000 |
| Dec. 8, 1952 | 68, 000 |
| Dec. 11, 1952 | 12, 000 |
| Dec. 31, 1952 | 44, 000 |
| Feb. 9, 1953 | 15, 000 |
| June 12, 1953 | 30, 000 |
| July 11, 1953 | 31, 000 |
| | $400, 000 |

On June 16, 1952, Bernard borrowed $50,000 from the Kanawha Valley Bank against the same collateral of 15,000 shares of Food Machinery and Chemical Corporation common stock and on June 17, 1952, he paid $50,000 as 10 per cent on the subscription to $500,000-par 2⅜ per cent United States Treasury Bonds. He repaid this

loan of $50,000 on July 1, 1952. On July 14, 1952, he borrowed $10,000 from Kanawha Valley Bank, again with the same collateral, and on July 15, 1952, he paid the balance of the purchase price of property in Baltimore, Maryland, in the amount of $12,555. This loan was repaid on October 1, 1952. On November 10, 1952, Bernard borrowed $100,000 from the Kanawha Valley Bank, using the same collateral, and on November 18, 1952, he purchased $50,000-par 3¾ per cent West Virginia Turnpike Bonds, which were wholly exempt from Federal income tax, for $48,000. He repaid this loan as follows:

| | |
|---|---|
| Nov. 20, 1952 | $50,000 |
| Aug. 29, 1953 | 25,000 |
| Sept. 10, 1953 | 25,000 |
| | $100,000 |

On December 15, 1951, Bernard borrowed $100,000 from the Charleston National Bank against collateral of 5,000 shares of Food Machinery and Chemical Corporation common stock and on the same date purchased $100,000-par 2½ per cent West Virginia Veterans Bonus Bonds, the interest from which was wholly exempt from Federal income tax, for $100,755.90. He repaid this loan as follows:

| | |
|---|---|
| Sept. 12, 1952 | $30,000 |
| Sept. 25, 1952 | 50,000 |
| Oct. 1, 1952 | 20,000 |
| | $100,000 |

Bernard sold the $100,000-par 2½ per cent West Virginia Veterans Bonus Bonds on October 28, 1952. On December 17, 1951, Bernard borrowed $30,000 from the First National Bank, South Charleston, against collateral of 1,250 shares of Food Machinery and Chemical Corporation common stock and on the same date purchased $30,000-par 2½ per cent West Virginia Veterans Bonus Bonds, the interest from which was wholly exempt from Federal income tax, for $30,217.26. He repaid this loan on December 27, 1951. These particular bonds were sold by Bernard on December 30, 1952. On March 13, 1952, Bernard borrowed $25,000 from the First National Bank, depositing collateral of 1,000 shares of Food Machinery and Chemical Corporation stock, and on March 14, 1952, paid the balance of his 1951 income tax, amounting to $16,882.74, and made a payment of $19,700 on his 1952 estimated income tax. He repaid this loan of $25,000 on October 1, 1952.

On December 15, 1951, Blanche borrowed $400,000 from the Kanawha Valley Bank, against collateral of 15,000 shares of Food Machinery and Chemical Corporation common stock, and on the same date purchased $400,000-par 2½ percent West Virginia Vet-

erans Bonus Bonds, the interest from which was wholly exempt from Federal income tax, for $400,642.52. This loan was repaid by Blanche as follows:

| | |
|---|---:|
| May 9, 1952 | $20,000 |
| Sept. 11, 1952 | 50,000 |
| Oct. 1, 1952 | 20,000 |
| Oct. 28, 1952 | 135,000 |
| Dec. 8, 1952 | 65,000 |
| Dec. 31, 1952 | 24,000 |
| Jan. 21, 1953 | 8,000 |
| July 11, 1953 | 28,000 |
| Aug. 29, 1953 | 25,000 |
| Sept. 10, 1953 | 25,000 |
| | $400,000 |

None of the "tax-exempt" bonds purchased by Bernard and Blanche and involved here were deposited with any bank as collateral for any loans obtained by them. The common stock of Food Machinery and Chemical Corporation which was deposited by Bernard and Blanche as collateral for the loans here involved was at all times listed on the New York Stock Exchange.

No restrictions were placed by the banks upon the use or disposition of the proceeds of any of the loans obtained by Bernard or Blanche. The proceeds of the loans obtained by Bernard and Blanche were deposited by them in their respective custodian accounts at the Kanawha Valley Bank, and the purchases of the tax-exempt bonds by them were accomplished through these custodian accounts. The custodian accounts were used by the respective parties to transact a part of their personal affairs and all of their business affairs, with the exception of Blanche's apparel shop, for which a separate account was maintained. A great number and variety of transactions, both personal and business in nature, were handled through these custodian accounts from December 15, 1951, after the deposit of the loan proceeds from the Kanawha Valley Bank, to December 31, 1952. On December 15, 1951, immediately prior to the deposit of the loan proceeds from the Kanawha Valley Bank, there was a cash balance of $53,857.94 in Bernard's custodian account. During the period from December 15, 1951, to December 31, 1952, deposits to Bernard's custodian account from all sources, including the balance on hand December 15, 1951, totaled approximately $1,700,000. Blanche's custodian account, immediately prior to the deposit by her of the loan proceeds from the Kanawha Valley Bank on December 15, 1951, showed a cash balance of $40,126.18. During the period from December 15, 1951, to December 31, 1952, deposits to Blanche's custodian account from all sources, including the balance on hand December 15, 1951, totaled approximately $800,000.

OPINION.

Section 23 (b) disallows deductions for interest on "indebtedness incurred or continued to purchase or carry obligations * * * the interest upon which is wholly exempt from the taxes imposed by this chapter." In *Denman* v. *Slayton*, 282 U. S. 514, it is stated the manifest purpose of this statute "was to prevent the escape from taxation of income properly subject thereto by the purchase of exempt securities with borrowed money." Petitioners borrowed money on several occasions from banks, giving as collateral for such loans common stock in a corporation which Bernard served in an executive capacity. Proceeds of these loans were deposited by both Bernard and Blanche in their respective custodian accounts at the Kanawha Valley Bank. Petitioners then made several purchases of tax-exempt bonds through these same custodian accounts. These purchases were generally made on the very same day the loans were obtained, with the exception of one such purchase of bonds in 1952 which was made 8 days after the loan was obtained. Again, with one exception, the amount of the tax-exempt bonds purchased was in each instance approximately the same as the amount of the loan obtained on that date. The one exception occurred in November 1952, when Bernard obtained a loan of $100,000 on the 10th of the month, purchased $50,000 par value of tax-exempt bonds on the 18th, and then repaid the unused $50,000 to the bank on the 20th. Respondent disallowed a deduction of $25,777.75 claimed by the petitioners in 1952 for interest payments made on these loans on the ground that such loans were incurred by the petitioners to purchase or carry obligations, the interest from which was wholly exempt from the Federal income tax.

Petitioners argue that the loans were not made to purchase tax-exempt obligations, contending that section 23 (b) "applies only where the *indebtedness* itself is incurred to acquire tax-exempts, and not to the situation where *part of the proceeds of a loan* are so used." They contend that section 23 (b) is also inapplicable "because the petitioners' indebtedness was not incurred for the purpose of acquiring tax-exempt obligations, and because the tax-exempts were acquired through and carried by petitioners' custodian account funds, rather than by the indebtedness in question."

Under the first part of their argument the petitioners seek to establish a distinction between (1) incurring an indebtedness in the process of acquiring tax-exempts through such means as brokers' loans or margin transactions and (2) incurring indebtedness in a manner completely independent from the acquisition of tax-exempts and using the proceeds of the indebtedness to purchase tax-exempts. Petitioners

then argue that Congress intended, in section 23 (b), to reach only the former type of transaction, and not the second. In making this argument the petitioners rely upon certain legislative history in connection with the Revenue Act of 1934, where the House made an unsuccessful attempt to extend the disallowance under section 23 (b). We have carefully examined the pertinent legislative materials and find that they do not support the conclusions drawn by the petitioners from such materials. Prior to 1934 (as now), the statutory disallowance was limited to interest paid or accrued "on indebtedness incurred or continued to purchase or cãrry obligations * * *." Sec. 23 (b), Revenue Act of 1932. In 1934 the House tried to revise this section with the language "on indebtedness incurred or continued to purchase or carry, or the proceeds of which were used to purchase or carry, obligations * * * the interest upon which is wholly exempt from the taxes imposed by this title * * *." H. Rept. No. 7835, 73d Cong., 2d Sess. (1934). This added language was eliminated by the Senate Finance Committee, which said:

Section 23 (b) of existing law prohibits the deduction of interest paid or accrued on indebtedness incurred or continued to purchase or carry tax-exempt securities. The indebtedness incurred by a bank to its depositors is not treated under existing law as indebtedness incurred or continued to purchase or carry tax-exempt securities. This section of the House bill provides that if the proceeds of indebtedness, such as bank deposits, are actually used to purchase or carry tax-exempt securities, no deduction shall be allowed for the interest incurred on such indebtedness. Your committee is of the opinion that the change made by the House bill will seriously interfere with the marketing of Government securities, which are bought for the most part by banks and financial institutions, and also presents grave administrative difficulties. Your committee, therefore, disagrees with the change made in this section by the House bill and recommends that the provisions of existing law be continued. [S. Rept. No. 558, 73d Cong., 2d Sess. (1934), 1939–1 C. B. 586, 604.]

It is obvious from this legislative history that the reason for the elimination of the House language by the Senate Finance Committee was the reluctance to extend the interest disallowance to banks which purchased or carried tax-exempt securities with the funds of depositors. We fail to see how any of this history supports the contentions made by the petitioners.

We believe that the plain language of section 23 (b) reaches the case before us. Petitioners incurred indebtedness at various banks, and, generally on the very same date, purchased tax-exempt securities in amounts that were, for the most part, the same as the amount of indebtedness incurred. We do not feel that the section is made inapplicable simply because the transactions were carried out through custodian accounts which were also used for a myriad of transactions both personal and business in nature. The fact that the petitioners,

in obtaining these loans, used as collateral the common stock owned by them in a chemical manufacturing corporation does not call for a different result. There is nothing in the statute or in the legislative history to suggest that section 23 (b) will apply only where the very tax-exempt securities purchased are used as collateral for the loan incurred. We do not mean to imply that under the statute every taxpayer who has indebtedness will lose his interest deduction if he buys or carries tax-exempt securities. See *R. B. George Machinery Co.*, 26 B. T. A. 594; *Sioux Falls Metal Culvert Co.*, 26 B. T. A. 1324; Rev. Rul. 389, 1955–1 C. B. 276. All that we hold here is that under the facts presented the indebtedness was clearly incurred to purchase the tax-exempt securities.

Petitioners make the alternative argument that only a portion of the indebtedness incurred was used to purchase tax-exempt obligations and that consequently only a similar portion of the interest paid can be disallowed under section 23 (b). In effect, the argument is that there were other funds in the custodian accounts, apart from the borrowed funds, and that these other funds were available to make the purchases of tax-exempt securities. We will use Blanche's custodian account to illustrate the argument. On December 15, 1951, Blanche's custodian account showed a cash balance of $40,126.18. On that same date, Blanche incurred an indebtedness of $400,000 and purchased $400,000-par 2½ per cent West Virginia Veterans Bonus Bonds. Blanche now contends that she should be given credit for the amount of the cash balance in her custodian account, or $40,126.18. We cannot agree. The statute disallows as a deduction the interest on an indebtedness incurred to purchase obligations. We think, from an examination of all the evidence before us, that the indebtedness incurred at various times by Bernard and Blanche was to purchase the various blocks of tax-exempt securities rather than merely to create a balance in a checking account. We cannot see how this is changed by the fact that petitioners may have had cash balances in their custodian accounts at the various times that an indebtedness was incurred by them. No one can show that these cash balances were or were not in fact used to meet a portion of the purchase price of the tax-exempt securities. Nor can we say that a first-in first-out method must be employed in tracing the funds in the custodian accounts. If the petitioners owned other assets, apart from the balances in the custodian accounts, at the time the purchases of tax-exempt securities were made, it is quite obvious that they could not insist that such other assets be subtracted from the amount of the loans incurred. Such other assets could have been used in making the purchases, and in such an event, the indebtedness would have been smaller, or per-

haps completely unnecessary. Simply because such other assets are available does not make it necessary to take them into consideration. We have to look at what was actually done. Here the cash balances were available in the custodian accounts at the times of the purchases of tax-exempt securities but they were still there after the purchases and obviously they were not used to make the purchases.

We hold that, with the exception of interest attributable to that part of the indebtedness incurred by Bernard on November 10, 1952, and not used to purchase tax-exempt securities, the various amounts of indebtedness as shown in our Findings of Fact, were incurred by Bernard and Blanche to purchase obligations, the interest upon which was wholly exempt from Federal income taxes, and that consequently the interest payments on such indebtedness in 1952 were properly disallowed by the respondent as deductions in that year.

By reason of our holding on this issue, it will not be necessary for us to decide a subsidiary issue concerning the proper year in which one of the interest payments here involved was made.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

WITHEY, *J.*, concurs in the result.

