J. GEORGE GOLD AND JENNIE R. GOLD, PETITIONERS, *v.* COMMISSIONER
OF INTERNAL REVENUE, RESPONDENT

Docket No. 80082.   Filed December 31, 1963.

J. George Gold, pro se.
*Roger Rhodes* and *John Schessler*, for the respondent.

OPINION

RAUM, *Judge:* Petitioner's 1956 return claimed a deduction of $20,390.59 as an "expense in respect of carrying" the $2 million Treasury notes which he had allegedly sold short to Gibraltar. He attempts to support the deduction under section 212(1) of the 1954 Code as an "ordinary and necessary expense paid or incurred during [1956] * * * for the production or collection of income." How that $20,390.59 figure was computed is nowhere explained in the record, but it appears to be equal to the interest accruing on the $2 million Treasury notes

during the period of the so-called short sale[2] and allegedly paid over by petitioner to Gibraltar through bookkeeping entries.

It is, of course, true that one who borrows securities in order to make a short sale may deduct the amount of interest or dividends which he pays to the lender in order to reimburse him for the interest or dividends that the lender would have received during the period of the loan. *Commissioner* v. *Wiesler*, 161 F. 2d 997 (C.A. 6) ; *Carl Shapiro*, 40 T.C. 34, 38; I.T. 3989, 1950–1 C.B. 34. However, that rule is inapplicable here because petitioner has failed to show that there was in fact any bona fide short sale of $2 million Treasury notes or that he in fact paid the amount in question in respect of the notes allegedly sold short.

The record fails to show that any such Treasury notes were ever borrowed by or on behalf of petitioner for delivery to Gibraltar; or that, even considering his agreement with Gibraltar as an undertaking to deliver the notes at a future time, he ever made any such delivery or ever in fact intended to make any such delivery; or that the closing of the transaction in April 1956 by bookkeeping entries pretending to reflect a "resale" of the notes to petitioner wasn't part of a preconceived plan that contemplated no actual dealings in Treasury notes.[3] It must not be overlooked that the burden of proof is upon the petitioner, and we will not assume facts in his favor without satisfying evidence, particularly in circumstances such as those disclosed by this record. Cf. *Carl Shapiro*, 40 T.C. 34, 39.

We cannot find on this record that there ever was any bona fide short sale between petitioner and Gibraltar. Nor is his position strengthened by the evidence relating to the $2 million Housing Authority notes which he purportedly purchased and put up as collateral for his alleged obligations under the "short sale" agreement. Although it is true that, unlike the nonexistent Treasury notes, there were specifically identifiable Housing Authority notes, it does not appear that petitioner ever acquired any ownership of or control over such notes for a period of even a split second. The various documents in evidence give merely a misleading appearance of the purchase of the notes by petitioner. When the smoke cleared away, these notes found themselves in the hands of an unrelated third party, namely,

---

[2] That amount appears to consist of two components: (a) $14,456.52, which represents the amount of the February 15, 1956, interest coupons of $29,944.75 minus the $15,488.23 interest which had already accrued in respect of those coupons by October 5, 1955, the time of the alleged short sale ; and (b) $5,934.07 interest accruing on the bonds from the date of the foregoing interest coupons, February 15, 1956, to the date of the alleged resale of the bonds by Gibraltar to petitioner in April 1956.

[3] See 2 Loss, Securities Regulation 1226 (2d ed. 1961) :

Today the courts' touchstone in distinguishing between gambling contracts on the one hand and short sales of securities (or commodity futures contracts or contracts to sell securities "when issued") on the other hand is whether there was an intent to deliver when the contract was made rather than merely to adjust price differences later.

Joseph Faroll & Co., a broker who appears to have been the true purchaser of those Housing Authority notes. There is no evidence whatever that after October 10, 1955, the so-called closing date for the transactions allegedly initiated on October 5, 1955, there were any Housing Authority notes or Treasury notes in the possession or control of either petitioner or Gibraltar. Nor is there any convincing evidence that any of the parties ever intended in fact to obtain any such notes with which to consummate the transactions which had theoretically been commenced. The various bookkeeping entries made thereafter on Gibraltar's books, which furnish the basis for petitioner's claimed $20,390.59 deduction, have all the earmarks of what is sometimes referred to as a bucket shop operation.

In view of the record before us, we have found that the "short sale" of the Treasury notes and "purchase" of the Housing Authority notes were interrelated component parts of a sham; that petitioner in fact made no short sale; and that he did not in fact pay the $20,390.59 purportedly reflected in his account on Gibraltar's books. The amount in question represents phantom interest on phantom notes in a phantom short sale. The disallowance of the claimed deduction is in accord with an ever lengthening line of decisions reaching like results in a variety of situations comparable to the one before us. *Carl Shapiro*, 40 T.C. 34; *Eli D. Goodstein*, 30 T.C. 1178, affirmed 267 F. 2d 127 (C.A. 1) ; *Broome* v. *United States*, 170 F. Supp. 613 (Ct. Cl.) ; *Sonnabend* v. *Commissioner*, 267 F. 2d 319 (C.A. 1), affirming per curiam a Memorandum Opinion of this Court; *Lynch* v. *Commissioner*, 273 F. 2d 867 (C.A. 2), affirming 31 T.C. 990 and *Leslie Julian*, 31 T.C. 998; *Egbert J. Miles*, 31 T.C. 1001; *Becker* v. *Commissioner*, 277 F. 2d 146 (C.A. 2), affirming a Memorandum Opinion of this Court; *Morris R. DeWoskin*, 35 T.C. 356, appeal dismissed (C.A. 7) ; *Perry A. Nichols*, 37 T.C. 772, affirmed 314 F. 2d 337 (C.A. 5) ; *Empire Press, Inc.*, 35 T.C. 136. Cf. *Knetsch* v. *United States*, 364 U.S. 361;[4] *Amor F. Pierce*, 37 T.C. 1039, affirmed 311 F. 2d 894 (C.A. 9) ; *A. A. Helwig*, 37 T.C. 1046; *United States* v. *Roderick*, 290 F. 2d 823 (C.A. 5) ; *Bridges* v. *Commissioner*, 325 F. 2d 180 (C.A. 4), affirming 39 T.C. 1064; *MacRae* v. *Commissioner*, 294 F. 2d 56 (C.A. 9), affirming in part and remanding in part 34 T.C. 20, certiorari denied 368 U.S. 955; *Kaye* v. *Commissioner*, 287 F. 2d 40 (C.A. 9), affirming per curiam 33 T.C. 511; *Weller* v. *Commissioner*, 270 F. 2d 294 (C.A. 3), affirming 31 T.C. 33 and *W. Stuart Emmons*, 31 T.C. 26, certiorari denied 364 U.S. 908; *William R. Lovett*, 37 T.C. 317.

---

[4] Indeed, while the *Knetsch* case was pending in the Supreme Court the parties herein filed a joint motion for continuance of the present case on the ground that the then undecided *Knetsch* case "involves the same issues as are presented in the [instant] * * * case, and the parties believe that the decision by the Supreme Court will provide a basis for disposing of the [instant] * * * case without litigation."

We may add that even if the $20,390.59 had been paid, it would not qualify for deduction, since in our view it was not related to the "production or collection" of income under section 212(1). We do not believe petitioner's testimony that he had any purpose in entering into these transactions other than to obtain a tax deduction, and, as we said in *Carl Shapiro, supra* at 39–40, "the avoidance of taxes hardly qualifies as 'the production or collection of income' under the statute, either literally or by any implication that is supported by any relevant legislative history." Moreover, even if the transactions herein were to be treated as bona fide, the claimed deduction would have to be disallowed in any event under section 265.[5] On the hypothesis that the transactions were bona fide the purchase of the tax-exempt Housing Authority notes would have to be regarded as having been financed by the proceeds of the short sale, with the result that the expenses incurred in connection with the short sale would have to be treated as allocable to tax-exempt income under section 265 and therefore nondeductible.[6] Cf. *Bernard H. Jacobson*, 28 T.C. 579; *Constance M. Bishop*, 41 T.C. 154.

*Decision will be entered for the respondent.*

---

[5] SEC. 265. EXPENSES AND INTEREST RELATING TO TAX-EXEMPT INCOME.
No deduction shall be allowed for—
   (1) EXPENSES.—Any amount otherwise allowable as a deduction which is allocable to one or more classes of income other than interest (whether or not any amount of income of that class or classes is received or accrued) wholly exempt from the taxes imposed by this subtitle, or any amount otherwise allowable under section 212 (relating to expenses for production of income) which is allocable to interest (whether or not any amount of such interest is received or accrued) wholly exempt from the taxes imposed by this subtitle.
   (2). INTEREST.—Interest on indebtedness incurred or continued to purchase or carry obligations (other than obligations of the United States issued after September 24, 1917, and originally subscribed for by the taxpayer) the interest on which is wholly exempt from the taxes imposed by this subtitle.
[6] The tax-exempt interest on the Housing Authority notes was an essential ingredient of the tax-avoidance device before us, for it was through the application of such alleged nontaxable receipts against the interest purportedly owed to Gibraltar on the Treasury notes that Gibraltar was able to create the illusion on its books that petitioner had "paid" the major part of the interest in respect of the Treasury notes. In fact, however, petitioner had no receipts of any kind, tax exempt or otherwise, from any Housing Authority notes and paid no interest in respect of the Treasury notes.