*Decision will be entered under Rule 50.*

JOHN E. LESLIE AND EVELYN G. LESLIE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2325–65.    Filed April 2, 1968.

*M. Bernard Aidinoff, Kendyl K. Monroe,* and *Benjamin Grund,* for the petitioners.

*John K. Antholis* and *Robert D. Whoriskey,* for the respondent.

SIMPSON, *Judge:* The respondent determined a deficiency in the income tax of John E. Leslie and Evelyn G. Leslie of $3,848.54 for the taxable year 1959. The only issue for decision is whether, within the meaning of section 265(2) of the Internal Revenue Code of 1954,[1] any of the indebtedness of Bache & Co., then a partnership engaged in the brokerage business, was incurred or continued to purchase or carry the tax-exempt securities owned by Bache.

### FINDINGS OF FACT

Some of the facts were stipulated, and those facts are so found.

The petitioners are individuals who were legal residents of New York, N.Y., at the time the petition was filed in this case. They filed a Federal joint income tax return for the taxable year 1959 with the district director of internal revenue, Manhattan, New York. John E. Leslie will be referred to as the petitioner.

The petitioner was a partner of Bache & Co. (Bache), a partnership that kept its books and filed partnership information returns for Federal income tax purposes using the accrual method of accounting. Its 1959 taxable year, which is involved in this case, ended on January 31, 1959. The petitioner's share of Bache's net profits for the partnership's 1959 taxable year was 2.75344 percent. Hereafter, unless otherwise noted, all findings of fact in regard to the operations of Bache are limited to its 1959 taxable year.

Bache's business consisted of buying and selling, as a broker for customers, securities traded on the New York Stock Exchange, the American Stock Exchange, other exchanges of which it was a member, and the over-the-counter market. Bache also bought and sold, as a broker for customers, commodity contracts traded on various commodity exchanges; bought and sold, as a dealer, over-the-counter securities and tax-exempt bonds; underwrote both taxable and tax-exempt securities; loaned to customers on margin to assist them in financing the purchase of securities; and provided investment and financial counseling. In addition, Bache had investments for its own account in both taxable and tax-exempt securities.

Bache acquired tax-exempt securities as a dealer for resale to customers, either by purchasing such securities on the open market or through its participation in syndicates that underwrote new issues of tax-exempt securities. In addition, Bache accepted orders from customers for tax-exempt securities. Bache also maintained a market in issues that it underwrote or in which it dealt. It did not encourage investment by the firm in such securities, and the securities were sold

---

[1] All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.

as quickly as possible. A "house rule" of Bache required the securities to be sold within 90 days.

None of the tax-exempt securities owned by Bache was used as collateral for any indebtedness incurred or continued by Bache because such use would, among other things, make it necessary for Bache to substitute such securities frequently since they are issued in small denominations, require the banks to use more physical space for their storage since such securities have more bulk than stock certificates, and require the banks to clip coupons from many of the securities. In addition, Bache's legal counsel advised that the use of tax-exempt securities as collateral for indebtedness might jeopardize the tax-exempt status of the interest on such securities.

Bache made many loans to customers with "margin accounts," and such loans constituted a significant source of profit to Bache since the interest rate on the margin account loans was at least one-half of 1 percent above the interest rate charged to Bache on its borrowings from the major banks. A margin account is a type of credit account, and its operation may be described as follows: A customer, desiring to borrow money to finance a portion of the cost of purchasing securities, opens a margin account with Bache. The customer then deposits cash in the amount required by the rules of the Board of Governors of the Federal Reserve System and the national securities exchanges of which Bache is a member. Such amount is usually a fixed percentage of the value of the securities to be purchased. The balance of the purchase price is then loaned by Bache to the customer, and the securities are pledged with Bache as collateral. Bache is authorized to repledge the securities purchased by customers on margin as collateral for its own borrowings. The extension of credit by Bache to customers having margin accounts tends to tie the customers to channeling their securities transactions through Bache.

Under the rules of the New York Stock Exchange, Bache could not pledge securities in any customer's margin account to a bank as collateral for borrowings by Bache in excess of 140 percent of the amount loaned by Bache to the customer. When a customer sold the securities in his margin account or repaid his indebtedness to Bache, the securities were required to be released from the pledge to Bache and, accordingly, from any repledge that Bache may have made of the same securities as collateral for its own borrowings.

There were no restrictions on the use of proceeds obtained by Bache from the repledge of customers' securities to banks; such proceeds could be used by Bache for any purpose of its business.

Bache was required by the rules of the New York Stock Exchange to maintain capital resources in the ratio of 1 to 20 of its total indebted-

ness. In practice, a ratio in excess of 1 to 15 was not favored by the exchange, and Bache tried to maintain its ratio between 1 to 12 and 1 to 14½. In addition to funds obtained from its general and limited partners, its capital resources included funds obtained by subordinated indebtedness. Bache obtained capital funds from customers who agreed, for a consideration, to subordinate their loans to the claims of general creditors and from other lenders who agreed, in exchange for a higher interest rate, to the subordination of their loans.

Generally, all cash receipts and disbursements of Bache were deposited and withdrawn daily from various general-purpose checking accounts maintained by Bache. Bache's deposits in such accounts included proceeds from bank borrowings and the securing of subordinated indebtedness, receipts from sales of securities owned by both Bache and its customers, cash advances by customers, cash from other brokers given as security for securities that Bache loaned to such brokers, and cash from advances and capital contributions from partners. Disbursements from such accounts included payment for purchases of securities by both Bache and its customers, cash withdrawals by customers, payment of principal and interest on loans to banks and subordinated lenders, payment of amounts due to other brokers, withdrawals by partners, and the replenishment of funds and special checking accounts maintained to pay operating expenses of Bache.

In Bache's general purpose checking accounts, funds were completely commingled so that the source of such funds could not be traced through the accounts to any particular application of the funds. For example, the proceeds from bank loans secured by customers' securities were commingled in the general accounts with all other proceeds of Bache; then, from such accounts, Bache, among other things, both loaned funds to customers for the purchase of securities on margin and made payments for the purchase of tax-exempt securities.

The amount of funds that Bache borrowed from banks was determined on a daily basis. This determination was made by a clerk who at a specific time each day would contact each section of the cashier's department to determine the amounts of receipts and disbursements to that point of the day and the amounts of receipts and disbursements that could be expected for the remainder of the day. If total disbursements for the day were expected to exceed total receipts, Bache would borrow from banks the amount needed to maintain a reasonable cash position. If total receipts for the day were expected to exceed total disbursements, Bache would repay to banks the amount not needed to maintain a reasonable cash position. No specific check of the amounts of receipts and disbursements from sales and purchases of tax-exempt

securities was made, nor was a specific check made of the amounts of debit balances in customers' margin accounts.

The average monthly value of Bache's assets was $168,193,418.94, and the average monthly value of all tax-exempt securities owned by Bache, excluding only tax-exempt securities acquired with customers' credit balances in commodity accounts, was $1,935,522.67. The average monthly balance of Bache's bank borrowings was $77,661,538.46, and the average monthly balance of its subordinated indebtedness was $3,208,391.35. The average monthly amounts due to Bache from its customers, largely because of margin accounts, was $133,965,259.92.

The total interest expense accrued by Bache on indebtedness was $2,853,271.65, and the total amount of interest income on tax-exempt securities was $58,933.24. Such income constituted less than one-fourth of 1 percent of Bache's gross income of $25,414,365.46 as shown on its partnership tax return.

On its partnership information return, Bache treated $972.48 of the total interest accrued by it as interest that was not deductible under section 265(2). This amount was based on a formula that had first been used in a revenue agent's report for Bache's taxable year ending in 1953.

The respondent's determination that $25,913 of the interest accrued by Bache was not deductible under section 265(2) was computed as follows: The total interest accrued by Bache less interest accrued on bank borrowings used to purchase U.S. Government bonds was multiplied by a fraction,[2] the numerator of which was the value of tax-exempt securities held by Bache (excluding the value of tax-exempt securities purchased with customers' credit balances in commodity accounts) less the value of tax-exempt securities for which payment had not yet been made and less the value of tax-exempt securities owned by partners and deposited with Bache in lieu of capital. The denominator of the fraction was the value of Bache's total assets less the value of U.S. Government bonds purchased with the proceeds of borrowings secured by such bonds, less the value of tax-exempt securities for which payment had not yet been made, and less the value of securities, including tax-exempt securities, owned by partners and deposited with Bache in lieu of capital.

The respondent determined in the notice of deficiency that Bache paid or accrued interest in the amount of $25,913 that was not deductible under 265(2) and thus that Bache had overstated interest allowable as a deduction on its partnership information return in the amount of $24,940.52. The petitioner's distributive share of the asserted overstatement was $686.71.

---

[2] All values in such fraction are average monthly values.

This case presents us with a new test of the scope of section 265(2) which denies a deduction for interest when indebtedness is incurred or continued to purchase or carry tax-exempt securities. Here we are asked whether a large business that regularly borrows large sums of money in the conduct of its business is to be denied some of its interest deduction because it also holds a relatively small amount of tax-exempt securities. The loans were not arranged for the specific purpose of purchasing tax-exempt securities, but Bache does claim a large deduction for the interest that it pays although it excludes some of the interest that it receives. Do these circumstances invoke an application of section 265(2) resulting in a denial of some of the deduction for interest paid?

In his return for 1959, the petitioner treated a small portion of the Bache indebtedness as subject to the rule of section 265(2), but now he claims that no portion of the Bache indebtedness is subject to that rule. The respondent, on the other hand, argues that a portion of Bache's interest expense is not deductible, and that such portion should be determined by multiplying the total interest expense by a fraction consisting roughly of the average monthly value of tax-exempt securities held by Bache over the average monthly value of Bache's total assets.

Section 265 provides in relevant part that:

SEC. 265. EXPENSES AND INTEREST RELATING TO TAX-EXEMPT INCOME.

No deduction shall be allowed for—

(1) EXPENSES.—Any amount otherwise allowable as a deduction which is allocable to one or more classes of income other than interest * * * wholly exempt from the taxes imposed by this subtitle, or any amount otherwise allowable under section 212 * * * which is allocable to interest * * * wholly exempt from the taxes imposed by this subtitle.

(2) INTEREST.—Interest on indebtedness incurred or continued to purchase or carry obligations * * * the interest on which is wholly exempt from the taxes imposed by this subtitle. * * *

A mere reading of the statute leaves us with questions as to what is meant by the phrase "incurred or continued to purchase or carry" and what significance should be drawn from the differences in the language of section 265(1) and section 265(2). For help in answering these questions, we look to the legislative history. The predecessor of section 265(2) first became a part of the law in the Revenue Act of 1917 (40 Stat. 300, 330, 334). The statute at that time provided that a deduction is allowed for interest paid on indebtedness "except on indebtedness incurred for the purchase of obligations or securities the interest upon which is exempt from taxation as income under this

title." The Revenue Act of 1918 (40 Stat. 1066) added the words "or continued" after "indebtedness incurred."

Also in connection with the Revenue Act of 1918, the House Ways and Means Committee, stating that the statute was "difficult of administration, for in many cases it is impossible to tell for what purpose indebtedness is incurred," proposed that interest should be deductible only to the extent that it exceeded the amount of tax-exempt interest received by the taxpayer. H. Rept. No. 767, 65th Cong., 3d Sess., p. 10 (1918). The Senate rejected the House proposal, and the House receded in conference. S. Rept. No. 617, 65th Cong., 3d Sess., pp. 6–7 (1918) ; H. Rept. No. 1037, 65th Cong., 3d Sess. (1919), 1939–1 C.B. (Part 2) 135. Then, in connection with the Revenue Act of 1924 and the Revenue Act of 1926, the House proposed similar amendments that would allow a deduction for interest not incurred in carrying on a trade or business only to the extent that such interest (and, in the Revenue Act of 1924, nonbusiness losses) exceeded income from tax-exempt obligations. H. Rept. No. 179, 68th Cong., 1st Sess., p. 21 (1924) ; H. Rept. No. 1, 69th Cong., 1st Sess., p. 7 (1925). The Senate again rejected the House amendments, and the House receded in the conferences, S. Rept. No. 398, 68th Cong., 1st Sess., p. 24 (1924) ; H. Rept. No. 844, 68th Cong., 1st Sess., p. 19 (1924). S. Rept. No. 52, 69th Cong., 1st Sess., p. 21 (1926) ; H. Rept. No. 356, 69th Cong., 1st Sess., p. 21 (1926).

Finally, as a part of the Revenue Act of 1934, the House again proposed to amend the predecessor of section 265(2). The House Ways and Means Committee explained the proposed change as follows:

Section 23(b) of existing law prohibits the deduction of interest on indebtedness incurred or continued to purchase or carry tax-exempt securities. Thus, indebtedness incurred by a bank on its deposits is not treated under existing law as indebtedness incurred or continued to purchase or carry tax-exempt securities. Therefore, a taxpayer carrying on the banking business may deduct all the interest paid on deposits even though such deposits are invested in tax-exempt securities. * * * This section of the bill provides that if the proceeds of indebtedness, such as bank deposits, are actually used to purchase or carry tax-exempt securities, no deduction shall be allowed for the interest incurred on such indebtedness. * * * [H. Rept. No. 704, 73d Cong., 2d Sess., pp. 21–22 (1934).]

At the same time, the Ways and Means Committee also proposed the substance of the rule which now appears as section 265(1) ; but when proposed by the Ways and Means Committee, it applied to all types of exempt income, including exempt interest.

The Senate disagreed with the changes in the rules of section 265(2) and took the position that the rule of section 265(1) should not apply to tax-exempt interest. The Senate Finance Committee report stated:

While your committee is in general accord with the House provision, it is not believed that this disallowance should be made to apply to expenditures incurred in earning tax-exempt interest. To do so might seriously interfere with

the sale of Federal and State securities, which would be unfortunate during the present emergency. Accordingly, your committee recommends that the disallowance be applied to all classes of tax-exempt income except interest. Thus, a bank or other financial institution will not be denied a deduction for expenses incurred in earning tax-exempt interest. [S. Rept. No. 558, 73d Cong., 2d Sess., p. 27 (1934).]

This legislative history is illuminating and furnishes some clarification of the legislative purposes, although not enough to eliminate the necessity of judicial interpretations. It is clear that different tests are to be applied under paragraphs (1) and (2) of section 265. Although paragraph (1) applied when deductions may be allocated to exempt income other than interest, paragraph (2) is not to be applied when the only basis is that an indebtedness may be allocated to the earnings of exempt interest. Nor is paragraph (2) to be applied merely because the proceeds of an indebtedness are used to purchase or carry tax-exempt securities. Paragraph (2) is to be applied only when the indebtedness was incurred or continued for the purpose of purchasing or carrying the tax-exempt securities. Although we can draw these conclusions from the legislative history, there remains the question as to what circumstances warrant an inference that indebtedness is incurred or continued for the purpose of purchasing or carrying tax-exempt securities. That question has been the subject of several judicial decisions.

In *R. B. George Machinery Co.*, 26 B.T.A. 594 (1932), the taxpayer sold farm and road machinery to the State of Texas and certain of its counties and municipalities. In payment, the taxpayer received deficiency warrants, which bore interest that was tax-exempt, from the various governmental units. Because of this, the taxpayer did not have cash necessary to operate its business and would therefore discount the warrants at a bank. The question was whether the taxpayer discounted the warrants for the purpose of purchasing or holding the warrants. The Board said no, the warrants were in no sense of the word an investment; the taxpayer preferred cash. The statute "was not intended to penalize legitimate business or to deny to it the right to deduct interest paid for borrowed money, which money was used for the purpose of carrying on its regular functions." (26 B.T.A. at 597) Although the Board used such sweeping language in explaining its holding, later courts have limited the holding by pointing out that the taxpayer had no opportunity to sell the warrants. *Wisconsin Cheeseman, Inc. v. United States*, 388 F. 2d 420 (C.A. 7, 1968); *Illinois Terminal Railroad Co. v. United States*, 375 F. 2d 1016 (Ct. Cl. 1967).

In *Bernard H. Jacobson*, 28 T.C. 579 (1957), the taxpayers several times borrowed funds from a bank on the security of common stock, deposited the proceeds in a custodian account used for investments, and on the same day or shortly thereafter, purchased tax-exempt secu-

rities that were for the most part in the same amount as the indebtedness incurred. The taxpayers argued that section 23(b) of the Internal Revenue Code of 1939 (now section 265(2)) applied only when the borrowed money is used directly to purchase the tax-exempt securities, such as brokers' loans or purchases on margin, but not when the proceeds of a loan are commingled with other funds of the purchaser. The Court rejected such a test, saying that "the indebtedness was clearly incurred to purchase the tax-exempt securities" and the section is not made inapplicable "simply because the transactions were carried out through custodian accounts which were also used for a myriad of transactions both personal and business in nature." (28 T.C. at 584–585)

In *Constance M. Bishop*, 41 T.C. 154 (1963), affd. 342 F. 2d 757 (C.A. 6, 1965), the taxpayer borrowed $159,000 from a bank and with it purchased stocks and debentures, the dividends and interest on which were subject to income tax. Later, she sold the stocks and debentures and purchased tax-exempt scurities in approximately the amount of the sales price of the stocks and debentures. The Court said that it must look at the underlying reason for the loan: "She continued the loan instead of repaying it with the proceeds of the sale of the non-tax-exempt securities, so that she would have the funds to purchase and hold tax-exempt securities." (41 T.C. at 160–161) Hence, the taxpayer was denied a deduction for the interest incurred on the indebtedness.

In *Illinois Terminal Railroad Co.* v. *United States, supra,* the taxpayer was formed in 1954 by a group of railroads to purchase the assets and assume the liabilities of a predecessor corporation for a total consideration of about $20 million. The taxpayer issued 2,000 shares of stock to the railroads, and they endorsed the taxpayer's $20-million note. Among the assets acquired by the taxpayer was a combination railway and highway bridge across the Mississippi River. In late 1958, the bridge was sold to a city for $9 million cash and $11 million par value municipal, tax-exempt bonds and then leased back to the taxpayer. Shortly thereafter, the taxpayer sold $3.2 million par value of the bonds for slightly less than $1 million. Over the next few years, the taxpayer received a number of inquiries about and offers to buy the remaining bonds, but such offers were refused. In late 1962, the taxpayer pledged the remainder of the municipal bonds as security for an issuance of its own bonds, the proceeds of which were used to pay off the balance of the $20-million note. The issue before the court, then, was whether the indebtedness was continued in order to carry the bonds. The court said it was necessary to establish a "sufficiently

direct relationship" between the continuance of the debt and the carrying of the tax-exempt bonds. The court concluded:

There is an obvious relationship between the debt and the tax-exempt bonds and it is apparent that continuation of the indebtedness was not necessary other than for the purpose of continuing to hold the bonds. There were undoubtedly good business reasons for holding the bonds apart from the favorable tax aspects, but the latter dominated. This conclusion need not jeopardize the taxpayer whose dominant reasons for continuing indebtedness are unrelated to carrying tax-exempt bonds. [375 F. 2d at 1023]

In *Wisconsin Cheeseman, supra,* the taxpayer was in the business of packaging fancy cheeses for sale as Christmas gifts; thus, its business was seasonal with most sales occurring the last 3 months of the year. Short-term bank loans were obtained annually from September through early November to meet financing needs and then repaid from late November through January. Sales receipts not needed to repay the bank loans were used to purchase municipal bonds and Treasury bills. The Treasury bills matured at staggered intervals and were used to meet off-season financial needs. The tax-exempt municipal bonds were used as collateral for the bank borrowings, enabling the taxpayer to borrow almost 100 percent of their value. In one of the years before the court, the taxpayer borrowed money to build a new plant; such loan was secured by a mortgage on the real estate. The proceeds of the loan were used to pay for construction and not directly to purchase municipal bonds.

The court applied the test of determining whether there was a "sufficiently direct relationship" between the taxpayer's debt and the carrying of the tax-exempt securities. The court found that this relationship existed with respect to the taxpayer's seasonal bank borrowings because the tax-exempt securities were used as collateral for such borrowings, and because—

the deduction should not be allowed if a taxpayer could reasonably have foreseen at the time of purchasing the tax-exempts that a loan would probably be required to meet future economic needs of an ordinary, recurrent variety. * * * (68–1 U.S.T.C. par. 9145)

However, as to the taxpayer's borrowing to build a new plant, the court did not find a sufficiently direct relationship, stating that business reasons dominated the mortgaging of the property—it was not necessary for the taxpayer to sacrifice liquidity.

In recapitulating these cases, we see that the courts have applied a purpose test in determining whether indebtedness is incurred or continued to purchase or carry tax-exempt securities. The finding of the taxpayer's purpose does not depend solely upon looking into his mind and learning what he was thinking; although his intentions are relevant, purpose may be inferred from his conduct and from the circum-

stances that confronted him. In *Jacobson*, *supra*, the coincidence in the times when money was borrowed and tax-exempts were purchased and the coincidence in the amounts borrowed and purchased warranted an inference as to the purpose of the borrowing. Likewise, in *Bishop*, *supra*, the use of the borrowed money justified an inference as to the purpose for continuing the indebtednesss. In *Illinois Terminal*, *supra*, the taxpayer had a choice—a choice of liquidating the tax-exempts and paying off the loan, or continuing the loan and holding the tax-exempts, and under these circumstances, the court inferred a purpose to continue the indebtedness in order to hold the tax-exempts. Similarly, in *Wisconsin Cheeseman*, *supra*, the taxpayer could have procured the necessary capital by liquidating its tax-exempts, instead of borrowing money, but since it chose to acquire the capital by borrowing it, the court found its purpose was to borrow so as to continue to hold the tax-exempts. On the other hand, when the taxpayer had no choice—no opportunity to avoid the borrowing by liquidating the tax-exempts, the court found that the purpose for incurring the indebtedness was not to hold the tax-exempts. *R. B. George Machinery Co.*, *supra*. The mere simultaneous existence of an indebtedness and the holding of tax-exempt securities does not cause section 265(2) to apply.

In the case before us, the facts are materially different from those cases in which the courts inferred that the purpose for the borrowing was to purchase or carry tax-exempt securities. The average amount of Bache's indebtedness at the end of each month during its 1959 taxable year was approximately $80 million, and the average amount of its tax-exempt securities held at the end of each such month was a little less than $2 million. Thus, there was some relationship between its indebtedness and its holding in tax-exempts—if it had held no tax-exempts, it would have had to borrow less. Nevertheless, we think that the circumstances of this case do not support an inference that indebtedness was incurred to purchase the tax-exempt holdings. When the daily decision was made as to whether Bache would borrow more or repay some of its loans, the evidence indicates that no one consciously considered that by selling off all the tax-exempts they could reduce the amount which had to be borrowed. Furthermore, unlike *Jacobson*, *supra*, there is no relationship between the amounts borrowed and the amount of tax-exempts purchased; and unlike *Bishop*, *supra*, the borrowed money was not traceable to the purchase or continued holding of tax-exempts. In this case, the necessary capital could not have been procured by liquidating the tax-exempts; tens of millions of dollars had to be borrowed, and the amount of tax-exempts was less than $2 million. Moreover, in this case, there was no plan to invest in and hold

tax-exempt securities as a desirable investment.[3] On the contrary, the tax-exempt securities that were owned by Bache were acquired as a consequence of its brokerage business and were held for only a minimum period of time. Under all these circumstances, there is not the relationship between the incurring of the indebtedness and the purchase of the tax-exempts to justify an inference that the money was borrowed for the purpose of acquiring the tax-exempts. The money was borrowed in the conduct of Bache's large and many-sided business activities, and the mere fact that they held a relatively small amount of tax-exempt securities does not justify the conclusion that some of the money was borrowed for that purpose. In the absence of a direct relationship between the borrowing and the purchase, we think that one cannot be inferred in these circumstances.

To state the respondent's argument reveals its weakness. He argues that Bache borrowed money for the purpose of conducting its business, including the holding of some tax-exempt securities; that since the use of the borrowed funds cannot be traced, it is reasonable to allocate them to all the business purposes of Bache; that since Bache cannot show that the borrowed funds were used for purposes other than the holding of tax-exempt securities, some of the borrowed money should be allocated to that purpose; and that his method of allocating some of the indebtedness to the purchase of the tax-exempt securities is reasonable. However, this proposition is manifestly inconsistent with the legislative purposes of section 265(2). The legislative history makes clear that section 265(2) was not intended to be applied merely on the basis of an *allocation* of indebtedness to the purchase or carrying of tax-exempt securities. A reasonable allocation may justify the application of section 265(1), but there must be more to apply section 265(2). The respondent's allocation may be reasonable, but its reasonableness does not justify the application of section 265(2). There must be a connection between the reason for incurring or continuing the indebtedness and the purchase or the carrying of the tax-exempt securities, and the respondent's very argument recognizes that no such relationship exists.

Our interpretation of the scope of section 265(2) is supported by the statements in the legislative history indicating that such provision is not to apply to "banks and financial institutions." A bank deposit gives rise to an indebtedness of the bank; but such an indebtedness is incurred in the course of banking business and for the

---

[3] Although the stipulation provides that Bache invested in tax-exempts, other evidence indicates that the tax-exempts which the partnership owned were acquired as an incident of the brokerage business—through participation in syndications, through maintaining a market in tax-exempts, and through purchases for customers. The evidence also indicates that the firm policy was to dispose of tax-exempts as promptly as possible. Taking all of this evidence into consideration, it appears that Bache had no plan to purchase tax-exempts and hold them as a desirable investment.

purpose of carrying on that business. Even if bank deposits are used to purchase tax-exempt securities, the funds were not acquired for that purpose. Although the committee reports contain no definition of the term "financial institution," it is reasonable to conclude that such term was meant to describe an institution like a bank—a person engaged in the business of borrowing and loaning money. Although Bache may be considered primarily engaged in the brokerage business, a significant aspect of that business was arranging purchases on margin by its customers and providing the necessary capital to finance such purchases. For those purposes, it had to borrow large sums of money, but like a bank, such funds were borrowed for the purposes of conducting its brokerage business and not for the purpose of purchasing or carrying the small amount of tax-exempt securities that were owned by the partnership. Thus, we think that the reference to "banks and financial institutions" also makes clear that section 265(2) was not intended to apply when a business like Bache borrowed large sums to conduct its brokerage business.[4]

Accordingly, we find that in its 1959 taxable year, Bache did not incur or continue any indebtedness to purchase or carry tax-exempt securities within the meaning of section 265(2). The petitioner is thus entitled to a deduction for his distributive share of all interest expense accrued by Bache for such taxable year.

In order to reflect the computations required by this opinion and the failure of the petitioner to contest other adjustments in the notice of deficiency,

*Decision will be entered under Rule 50.*

Reviewed by the Court.

---

TANNENWALD, *J.*, dissenting. I have no quarrel with the lesson which the majority draws from the legislative history of section 265 and its predecessors or from the decided cases. My disagreement stems from the manner in which the lesson is applied to the facts herein. In the first place, I think the majority has placed far too much weight on the small amount of Bache's purchases of tax-exempt securities in relation to the totality of its business operations. In the second place, the analogy between Bache and a bank, while it may have a seductive appeal, is, in my opinion, misplaced. Bache may well be classified as

---

[4] A contrary inference might conceivably be drawn from the 1964 enactment of a provision allowing a face-amount certificate company a partial exemption from the application of sec. 265(2). The need for such a statutory exemption may be thought to indicate that sec. 265(2) would otherwise apply to such a company, whose operations in this regard may be analogous to Bache's. On the other hand, the amendment may have been enacted merely to assure a face-amount certificate company a limited exemption, and to avoid the uncertainties resulting from a determination of the purposes for its borrowings. Furthermore, the conference committee report admonishes us not to draw any inferences from the enactment of the amendment as to the application of sec. 265(2) to other years. H. Rept. No. 1149, 88th Cong., 2d Sess., pp. 31–32 (1964).

a "financial institution" in a broad sense, but no elaborate comparison of the commonly known functions of a bank and a brokerage firm is needed to point up the marked differences between the two. Moreover, even assuming that a bank's relationship to its depositors is that of "borrower-lender"—a concept that has been the subject of great dispute—at least one further notable difference emerges. A bank's "borrowings" precede and generate the purchase of the tax exempts. In this case, Bache's purchase of the tax exempts preceded and generated the borrowing.

Bache, as an ongoing integral part of its business operations, regularly purchased tax-exempt securities in the course of its participation in underwriting securities and also regularly bought tax-exempt securities to help maintain a market in the issues of this type in which it was interested. It cannot be gainsaid that such purchases were for its own account and not for the account of customers. The fact that it had a house rule pursuant to which it sought to sell tax-exempt securities thus purchased within 90 days does not militate against this conclusion. It is clear that Bache calculated its borrowing needs in terms of its daily cash requirements, of which cash used to purchase tax exempts was one. Under these circumstances, there is a sufficiently direct identification between the purchases and the borrowings to warrant the application of section 265(2) and I would therefore sustain respondent's determination. Cf. *Paul P. Prudden*, 2 B.T.A. 14 (1925).

Nor does the legislative history eliminating interest from the allocation provision of section 265(1) require a contrary result. That section was intended to preclude the disallowance of a portion of interest paid or accrued merely because a taxpayer happened both to have purchased tax-exempt securities and borrowed funds in the same year. Where, as here, a portion of borrowings can be identified with such purchases, it does not prevent disallowance any more than it would in the case where a taxpayer makes a single borrowing of $100,000 and, in accordance with a predetermined plan, uses $50,000 to purchase tax-exempt securities and $50,000 for other purposes.

RAUM and SCOTT, *JJ.*, agree with this dissent.