ESTATE OF DELLORA A. NORRIS, CONTINENTAL ILLINOIS NATIONAL BANK AND TRUST COMPANY OF CHICAGO, GEORGE N. GAYNOR AND ROBERT C. NORRIS, CO-EXECUTORS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Norris v. Commissioner
Docket No. 1852-78.
United States Tax Court
T.C. Memo 1981-368; 1981 Tax Ct. Memo LEXIS 374; 42 T.C.M. (CCH) 408; T.C.M. (RIA) 81368; July 16, 1981. *374 At a time when she owned tax-exempt obligations, decedent borrowed from a bank and used the loan proceeds to pay a portion of her Federal tax liabilities. Held, under the particular circumstances of this case, decedent did not incur or continue indebtedness for the purpose of purchasing or carrying tax-exempt obligations within the meaning of sec. 265(2), I.R.C. 1954. John K. O'Connor and Leland E. Hutchinson, for the petitioners. Tom Quinn, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined deficiencies of $ 48,918.26 and $ 72,756.53 in decedent's [1] Federal income taxes for 1973 and 1974, respectively. After concessions, the issues remaining for decision are: (1) Whether decedent incurred or continued indebtedness in order to purchase or carry tax-exempt obligations within the meaning of section 265(2). *375 [2]
(2) Whether decedent is entitled to an ordinary loss deduction in 1974 on the worthlessness of section 1244 stock. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Decedent Dellora A. Norris resided in St. Charles, Illinois, when she filed her 1973 and 1974 Federal income tax returns with the Internal Revenue Service Center, Kansas City, Missouri, and when she filed her petition in this case. Issue 1: Section 265(2) During the years at issue, decedent owned a substantial investment portfolio which included corporate stocks as well as debt instruments of various governmental units, the income from which was exempt from Federal income taxation. During those years, decedent also owned assets other than those in her investment portfolio. Decedent's investment advisors considered it prudent to include tax-exempt securities in her portfolio and had purchased such securities on her behalf for over thirty years. The bulk of decedent's portfolio consisted of common stock in Texaco, Inc., which she had inherited, along with other stocks, in 1918. *376 Decedent's adjusted basis in the Texaco stock was less than two dollars per share. Prior to 1969, decedent's husband, Lester J. Norris, managed her investments while she devoted most of her time to raising her family. Although Mr. Norris frequently purchased real estate and often invested decedent's money in business ventures, he generally ignored decedent's portfolio with the result that her holdings remained essentially unchanged for many years. Decedent and Lester Norris separated in 1969. In 1969, decedent employed an experienced business consultant, George Saum, to manage her investments and business affairs. At that time, decedent owned more than 2,900,000 shares of Texaco stock which represented approximately 85 percent of her total stock and security holdings. Saum believed that such a heavy investment in one company was unduly risky and, therefore, recommended that decedent begin diversifying her portfolio. Saum also examined decedent's potential estate tax liability in view of the fact that she was then 67 years old. After observing the differences at that time between the highest marginal estate tax and gift tax rates, Saum advised decedent to embark upon an extensive *377 and consistent program of family gifts to minimize her eventual estate tax liability. Since decedent had never taken an active interest in managing her financial affairs, she relied heavily upon Saum's expertise in these matters and promptly followed his recommendations. During 1969 and 1970, decedent made substantial gifts of Texaco stock to her children, their spouses, and to trusts for the benefit of her children and grandchildren. She paid gift taxes of $ 1,547,565 and $ 14,195,563, respectively, in those years. In April 1970, decedent commenced a diversification program by selling 200,000 shares of Texaco common stock and approximately 12,000 shares of other corporate stocks for $ 5,487,900. One-half of the sales proceeds was immediately turned over to the Continental Illinois National Bank and Trust Co. (hereinafter Continental) and the other half to the investment firm of Stein Roe & Farnham (hereinafter Stein Roe) to be invested on behalf of decedent. The purpose of dividing the proceeds in half was to create a so-called "horse race" between Continental and Stein Roe whereby the more successful investment advisor would eventually be given the entire fund to manage. Due *378 to her low basis in the Texaco stock, decedent incurred substantial capital gains taxes on the diversification sales. In order to satisfy both her gift tax and income tax liabilities for 1970, decedent sold an additional 100,000 shares of Texaco stock in late 1970 and another 310,000 shares in early 1971. These later sales generated capital gains taxes of approximately $ 900,000 in 1970 and $ 3,200,000 in 1971. In April 1971, decedent's 1970 gift tax and income tax returns were reviewed by George Gorski, a tax manager at the accounting firm of Arthur Anderson & Co. In the course of examining those returns, Gorski recommended to both Saum and decedent's office manager, Norman J. Nelson, that decedent should consider borrowing funds in the future to pay her taxes instead of raising the necessary cash by selling additional low basis Texaco stock and paying enormous capital gains taxes on such sales. Decedent and her advisors unanimously agreed with Gorski's suggestion and asked Lyle F. Veitch, vice-president of Continental, whether the bank would loan decedent funds for this purpose. After discussing the request with several loans officers at the bank, Veitch informed Nelson on *379 May 13, 1971, that Continental would make funds available for decedent to meet her tax obligations. Prior to 1971, decedent had never borrowed any money from a bank. During the years 1971, 1972, and 1973, decedent borrowed the following amounts from Continental on the dates indicated: Date
Amount
September 16, 1971
$ 400,000
January 14, 1972
700,000
April 14, 1972
100,000
February 15, 1973
3,900,000
The decision to borrow each of those sums was made by decedent's business advisors shortly before the actual loan dates. Following the loan on April 14, 1972, and continuing until late December of that year, neither decedent's advisors nor the officer at Continental believed that additional loans would be needed to meet decedent's Federal tax payments. [3] *380 The first three loans were unsecured, but concurrent with the loan of February 15, 1973, decedent pledged 190,000 shares of Texaco common stock as collateral. At the request of Continental, she pledged an additional 60,000 shares on March 21, 1974. For each of the loans, decedent executed a promissory note payable on demand with interest computed at the prime rate in *381 effect from time to time. In October 1973, decedent executed a single demand note for $ 5,100,000 covering the previous four loans. Interest on this note was also at a floating prime rate. At that time, decedent also agreed to maintain average monthly compensating balances in her checking account at Continental equal to 15 percent of the outstanding loan balance. Prior to obtaining the four loans in question, decedent had cash balances in that checking account of $ 153,114.75, $ 521,827.63 $ 12,899.46, and $ 284,315.16, respectively. The amounts borrowed by decedent were credited to her Continental checking account and immediately transferred, together with some funds already on deposit in that account, to her agency account at the bank (Account No. 39-01474). Bank records and internal memoranda prepared by Continental contemporaneously with these transactions stated that the foregoing amounts were transferred to Account No. 39-01474 to cover payment of decedent's taxes. These funds were then used to pay, in part, the following Federal taxes on the dates indicated: Date
Description
Amount
September 15, 1971
1971 estimated Federal
$ 1,107,600
income taxes
January 15, 1972
1971 estimated Federal
1,107,600
income taxes
April 15, 1972
1971 Federal income tax
638,572
balance
April 15, 1972
1972 estimated Federal
440,000
income taxes
February 15, 1973
1972 Federal gift taxes
4,079,352
The *382 portion of decedent's taxes not satisfied by the transferred funds was paid primarily with the dividends received on taxable securities held in the agency account. For each of the years 1969 through 1974, decedent paid Federal taxes as follows: Year
Income Tax
Gift Tax
1969
$ 2,719,570
$ 1,547,565
1970
4,430,257
14,195,563
1971
5,068,972
1,710,852
1972
1,969,780
4,079,352
1973
1,480,552
62,220
1974
1,582,988
$ 17,252,119
$ 21,595,552
During the years 1973, 1974, and 1975, decedent's payments of Federal income and gift taxes consisted of the following: Date
Description
Amount
1/15/73
1972 estimated income
$ 800,000
tax installment
2/15/73
1972 gift tax
4,079,352
4/15/73
1972 income tax balance
79,780
4/15/73
1973 estimated income
432,000
tax installment
5/150/73
1973 gift tax
62,220
9/15/73
1973 estimated income
300,000
tax installment
1/15/74
1973 estimated income
650,000
tax installment
2/18/74
1970 gift tax deficiency
489,864
4/15/74
1973 income tax balance
98,552
4/15/74
1974 estimated income
$ 370,138
tax installment
9/15/74
1974 estimated income
350,000
tax installment
1/15/75
1974 estimated income
750,000
tax installment
4/15/75
1974 income tax balance
112,850 Beginning in 1974, decedent made the following principal payments with respect to the *383 Continental loans on the dates indicated. Date
Payment
Balance
7/26/74
$ 100,000
$ 5,000,000
9/25/74
200,000
4,800,000
1/14/75
200,000
4,600,000
4/18/75
300,000
4,300,000
6/11/75
300,000
4,000,000
6/15/76
1,300,000
2,700,000
9/13/76
300,000
2,400,000
4/22/77
300,000
2,100,000
6/23/77
400,000
1,700,000
1/18/78
300,000
1,400,000
2/10/78
400,000
1,000,000
3/22/78
200,000
800,000
6/22/78
800,000
The outstanding principal balances on these loans as of December 31, 1973 and December 31, 1974, were $ 5,100,000 and $ 4,800,000, respectively. During 1973 and 1974, decedent paid interest on her indebtedness to Continental in the respective amounts of $ 379,141.65 and $ 548,597.91. Decedent did not incur any other interest bearing indebtedness during those years. From 1970 through 1974, decedent's investment activities were handled principally through three accounts, two of which were maintained with Continental and the third with Stein Roe. One of the accounts managed by Continental (Account No. 40-86909), the so-called "horse race" account, purchased no tax-exempt securities during 1973 and 1974. This Continental account was closed by decedent in June 1974, with a transfer of its assets to Account No. 39-86875 managed by Stein *384 Roe. Decedent's principal investment account at Continental was an agency account (Account No. 39-01474), over which her duly authorized agents at the bank maintained discretionary control. Agency Account No. 39-01474 was also the same account to which the loan proceeds were transferred and from which decedent paid her taxes and other expenses. The vast majority of decedent's taxable and tax-exempt securities were held in this account. During 1973, decedent's agency account purchased approximately $ 2,000,000 of long-term tax-exempt securities in an attempt to upgrade her bond portfolio. The funds used to purchase these securities were generated from sales of existing low interest tax-exempt obligations which decedent had owned for many years. In June 1972, the agency account purchased $ 350,000 of short-term tax-exempt obligations maturing in March 1973. During 1973 and 1974, purchases and maturities of tax-exempt securities held in the agency account were as follows: 1973
1974
Purchases at cost
$ 900,536
$ 296,787
Maturities [4]
704,411
550,059
The tax-exempt securities purchased in 1973 consisted of the following three short-term *385 municipal obligations maturing on the dates indicated: Municipality
Face Amount
Purchased
Matured
Toledo, Ohio
$ 350,000
4/03/73
[5] 9/07/73
Muskegan, Michigan
200,000
7/11/73
1/11/74
New York, New York
350,000
9/12/73
1/01/74
The tax-exempt securities purchased in 1974 included a long-term obligation having a face value of $ 200,000 and a short-term obligation with a face value of $ 100,000. The agency account purchased the short-term tax-exempt securities in 1972 through 1974 to accumulate funds to pay installments of Federal income taxes due at or about the time the securities matured. The Stein Roe so-called "horse race" account, Account No. 39-86875, was opened on April 1, 1970, pursuant to a service contract between decedent and Stein Roe. During 1970, the account purchased $ 50,000 of long-term tax-exempt securities. No tax-exempt securities were purchased by this account during 1971 or 1972. During 1973, the account purchased five blocks of long-term tax-exempt securities each with a face value of $ 50,000. One of the blocks was purchased before February *386 15, 1973, while the remaining four blocks were acquired thereafter. One additional block of long-term tax-exempt securities with a face value of $ 50,000 was purchased in April 1974. None of the tax-exempt securities purchased through the Stein Roe account matured or was sold in either 1973 or 1974. Stein Roe's decision to purchase tax-exempt securities during 1973 and 1974 was based on two considerations. First, market conditions had imperiled its lead in the "horse race" with Continental and, therefore, a more conservative investment pattern was desired. Second, it was part of Stein Roe's basic investment policy to increase the tax-exempt holdings of high bracket taxpayers, such as decedent. At the time Stein Roe purchased the tax exempts, it was not aware that decedent had borrowed funds from Continental. Except for two minor restrictions, Stein Roe managed Account No. 39-86875 without direction or input from decedent or her advisors. The first restriction on their discretion was that no oil stocks be purchased because of decedent's large holdings of Texaco stock. The second restriction was that no foreign stocks be purchased without prior clearance from decedent. Other than *387 these two limitations on their investment authority, Stein Roe had complete discretion with respect to purchases and sales of both taxable and tax-exempt securities. After purchasing these securities, Stein Roe prepared and forwarded to decedent a detailed report outlining their investment activities on her behalf. Decedent had no knowledge of Stein Roe's investment until she received those reports. Stein Roe independently made the decision to acquire the tax-exempt securities it purchased for decedent during 1973 and 1974. During 1973 and 1974, purchases and sales of taxable securities [6] held in decedent's investment accounts were as follows: 1973
1974
Purchases
$ 4,624,314
$ 2,306,426
Sales
4,888,084
2,573,846
Substantially all of the sales of taxable securities were made after decedent's final borrowing on February 15, 1973. During 1973 and 1974, decedent incurred net capital losses on the sale of taxable securities in the amounts of $ 374,255.46 and $ 578,945.45, respectively. The adjusted basis (AB) and fair market value (FMV) of decedent's portfolio of taxable securities, tax-exempt securities and total assets were as *388 follows as of December 31, 1972, 1973, and 1974: Taxable Securities
Tax-Exempt
Year
AB
FMV
AB
FMV
12/31/72
$ 9,041,261.47
$ 76,963,925.93
$ 2,293,539.36
$ 2,505,613.00
12/31/73
8,888,075.10
60,710,852.68
2,735,265.84
2,961,562.00
12/31/74
8,757,179.99
42,390,598.84
2,628,188.10
2,513,956.00
Total Assets [7]
Year
AB
FMV
12/31/72
$ 14,607,904.12
$ 82,694,449.06
12/31/73
14,556,087.20
66,597,955.06
12/31/74
14,677,663.97
48,210,527.64
On the basis of fair market values, decedent's tax-exempt securities constituted 3.66 percent of the average of the total assets during 1973 and 4.77 percent of the average of her total assets during 1974. Pursuant to a method of computation utilizing adjusted basis, decedent's tax-exempt securities constituted 17.23 percent of the average of her total assets during 1973 and 18.34 percent of the average of the total assets during 1974. At the close of each month from December 1972 through January 1975, decedent had cash balances in her Continental checking account and in all of her investment accounts as follows: All Accounts (including
Continental checking
account and three
Date
Continental
investment accounts)
Dec. 31, 1972
$ 1,033,262
$ 1,320,118
Jan. 31, 1973
282,506
683,531
Feb. 28, 1973
93,186
233,592
Mar. 31, 1973
733,404
792,769
April 30, 1973
201,744
310,359
May 31, 1973
106,560
195,780
June 30, 1973
494,009
731,692
July 31, 1973
303,957
596,686
Aug. 31, 1973
266,252
557,135
Sept. 30, 1973
557,243
822,544
Oct. 31, 1973
498,773
626,747
Nov. 30, 1973
463,967
802,333
Dec. 31, 1973
1,073,384
1,349,158
Jan. 31, 1974
404,547
1,153,871
Feb. 28, 1974
379,392
528,718
Mar. 31, 1974
1,102,791
1,244,679
April 30, 1974
597,286
680,940
May 31, 1974
552,131
721,454
June 30, 1974
1,217,465
1,388,949
July 31, 1974
916,740
1,178,496
Aug. 31, 1974
790,678
1,113,731
Sept. 30, 1974
1,141,490
1,350,537
Oct. 31, 1974
704,734
946,260
Nov. 30, 1974
667,003
909,788
Dec. 31, 1974
1,488,726
1,804,033
Jan. 31, 1975
546,708
1,544,216
*389 The large balances in these accounts at various times were attributable to decedent's receipt of cash dividends on her taxable securities, a substantial portion of which was used to make tax payments. Decedent's interest income from the tax-exempt securities and her adjusted gross income in 1973 and 1974 were as follows: Year
Tax-Exempt Income
Adjusted Gross Income
1973
$ 134,008
$ 2,908,083
1974
143,111
3,476,576
During the years 1973 and 1974, decedent was not a dealer in securities, within the meaning of section 1,471-5, Income Tax Regs.
On her Federal income tax returns for 1973 and 1974, decedent deducted interest paid to Continental in the respective amounts of $ 379,141.65 and $ 548,597.91. In his notice of deficiency, respondent disallowed $ 65,362.69 of the claimed interest deduction for 1973 and $ 100,649.61 for 1974 with the explanation that such amounts represent interest on indebtedness incurred or continued to purchase or carry obligations the interest on which is exempt from tax. Issue 2: Loss on Section 1244 Stock
On October 17, 1973, decedent purchased 900 shares of common stock in International Security Systems, Inc. (ISS) for $ 25,000. ISS was a Colorado corporation *390 engaged in the business of selling alarm systems to automobile manufacturers. During 1974, ISS experienced business difficulties largely attributable to the economic downturn in the automobile industry. During that year, ISS borrowed funds from decedent's son, Robert C. Norris, and from various banks in order to finance its operations. At the close of 1974, ISS had contracts for work outstanding, accounts receivable, and assets in a California warehouse. By way of amended petition, decedent claimed a $ 25,000 ordinary loss for 1974 due to the worthlessness of section 1244 stock. In his answer to the amended petition, respondent denied this claim. OPINION Issue 1: Section 265(2) The first issue for decision is whether a portion of decedent's claimed interest expense deduction for 1973 and 1974 should be disallowed under section 265(2) which bars a deduction for interest on indebtedness "incurred or continued to purchase or carry" tax-exempt obligations. Resolution of this issue turns on the application of well settled principles of law to the particular facts before us. As expressed in prior judicial decisions beginning with Denman v. Slayton, 282 U.S. 514, 515 (1931), the manifest *391 purpose of section 265(2) is to prevent a taxpayer from reaping a double tax benefit by deducting interest on borrowed funds which the taxpayer uses to purchase or carry securities bearing tax-exempt interest. Levitt v. United States, 517 F. 2d 1339, 1343 (8th Cir. 1975); Norfolk Shipbuilding & Drydock Corp. v. United States, 321 F. Supp. 222, 229 (E.D. Va. 1971); see Jacobson v. Commissioner, 28 T.C. 579 (1957). While the statute is obviously aimed at preventing this form of tax avoidance, the legislative history of section 265(2) clearly reveals that Congress intended to disallow an interest deduction only upon a showing that the indebtedness was either incurred or continued for the "purpose" of acquiring or holding tax-exempt obligations. See, e.g., H. Rept. No. 767, 65th Cong., 2d Sess. 30 (1918); S. Rept. No. 617, 65th Cong., 3rd Sess. 6-7 (1918); S. Rept. No. 398, 68th Cong., 1st Sess. 24 (1924); S. Rept. No. 558, 73rd Cong., 2d Sess. 27 (1934). In accordance with this legislative intent, the courts have interpreted the statute as requiring a "purposive connection" or a "sufficiently direct relationship" between the taxpayer's indebtedness and his ownership of tax-exempt obligations. *392 Swenson Land & Cattle Co. v. Commissioner, 64 T.C. 686, 696 (1975); see also Wisconsin Cheeseman Inc., v. United States, 388 F. 2d 420, 422 (7th Cir. 1968); Illinois Terminal Railroad Co. v. United States, 179 Ct. Cl. 674, 683, 375 F. 2d 1016, 1021 (1967); Baker v. Commissioner, 75 T.C. 166, 172 (1980). Thus, it is now well settled that section 265(2) does not automatically bar an interest deduction simply because a taxpayer incurred or continued an indebtedness at the same time that he owned tax-exempt securities. Levitt v. United States, supra at 1344; Mariorenzi v. Commissioner, 490 F. 2d 92, 93 (1st Cir. 1974), affg. a Memorandum Opinion of this Court; Handy Button Machine Co. v. Commissioner, 61 T.C. 846, 852 (1974). The mere fact that a taxpayer borrowed funds when his needs could have been met by selling exempt obligations is, therefore, not enough to invoke section 265(2). Indian Trail Trading Post, Inc. v. Cimmissioner, 60 T.C. 497, 500 (1973), affd. 503 F. 2d 102 (6th Cir. 1974); see Norfolk Shipbuilding & Drydock Corp. v. United States, supra at 231-232. Where the facts establish that the indebtedness is independent of the holding of tax-exempt obligations, the prohibited *393 purpose will not be found. See New Mexico Bancorporation v. Commissioner, 74 T.C. 1342, 1353 (1980); Investors Diversified Services, Inc. v. United States, 216 Ct. Cl. 192, 575 F. 2d 843, 853 (1978); cf. Wisconsin Cheeseman, Inc. v. United States, supra at 423. In determining a taxpayer's purpose for incurring or continuing an indebtedness, the courts are not confined to evaluating evidence of subjective intent, but may draw inferences from the taxpayer's conduct and the circumstances surrounding the relevant transactions. Handy Button Machine Co. v. Commissioner, supra at 851; Leslie v. Commissioner, 50 T.C. 11, 20-21 (1968), revd. on other grounds 413 F. 2d 636 (2d Cir. 1969). In previous cases, the courts have usually inferred the requisite purposive connection whenever the proceeds of the borrowing are directly traceable to the purchase of tax-exempt securities. E.g., Wynn v. United States, 411 F. 2d 614 (3d Cir. 1969), cert. denied 396 U.S. 1008 (1970); Kirchner, Moore & Co. v. Commissioner, 54 T.C. 940 (1970), affd. 448 F. 2d 1281 (10th Cir. 1971); Bishop v. Commissioner, 41 T.C. 154 (1963), affd. 342 F. 2d 757 (6th Cir. 1965). Similarly, most courts have disallowed the *394 interest deduction where tax-exempt securities are used as collateral for the indebtedness. E.g., Levitt v. Commissioner, supra at 1345; Wisconsin Cheeseman, Inc., v. United States, supra at 422; Phipps v. United States, 206 Ct. Cl. 583, 515 F. 2d 1099, 1102 (1975); but see New Mexico Bancorporation v. Commissioner, supra; R.B. George Machinery Co. v. Commissioner, 26 B.T.A. 594 (1932). Where neither of these two factual patterns exists, the courts have closely examined the particular facts and circumstances of the case to ascertain whether the requisite relationship can reasonably be inferred. In every case, however, the taxpayer has the burden of proving his sanitary purpose for incurring or continuing his indebtedness. Handy Button Machine Co. v. Commissioner, supra at 852; Rule 142(a), Tax Court Rules of Practice and Procedure.
In the instant case, respondent does not assert that decedent's borrowings from Continental were directly traceable to her purchasing or carrying of tax-exempt securities or that any of those securities served as collateral for the indebtedness. Instead, respondent contends that the proscribed purpose can be inferred from decedent's conduct "revealing *395 the purchases or retention of tax-exempt holdings and a contemporaneous pattern of either assuming or continuing outstanding loan indebtedness." Petitioners, on the other hand, maintain that decedent's indebtedness was incurred solely for the purpose of paying her tax liabilities and bore no relationship whatsoever to her ownership of tax-exempt securities. For the reasons set forth below, we agree with and hold for petitioners. An examination of the circumstances surrounding decedent's borrowings clearly demonstrates the absence of any "purposive connection" between those borrowings and her ownership of tax-exempt securities. The record shows that prior to the initial borrowing from Continental on September 16, 1971, decedent made gifts of Texaco stock to various individuals and trusts and also sold 200,000 shares of Texaco to diversify her investment portfolio. Due to the magnitude of those gifts and her low basis in the stock, decedent incurred substantial gift tax and income tax liabilities for the years 1969 and 1970. In order to raise the huge amounts of cash required to satisfy those liabilities, decedent sold an additional 410,000 shares of Texaco stock in late 1970 and *396 early 1971, paying capital gains taxes on such sales of approximately four million dollars. During a review of decedent's 1970 tax Co. returns in April 1971, George Gorski of Arthur Anderson & suggested that decedent should borrow to pay her future tax obligations instead of meeting those needs by selling more low basis Texaco stock and incurring enormous capital gains taxes. Decedent and her business advisors agreed with this recommendation and made the requisite loan arrangements with Continental. As George Saum testified at trial, to continue selling Texaco stock under these circumstances would be like "chasing your tail." Accordingly, decedent borrowed $ 5,100,000 over a period of 1-1/2 years and immediately used all the loan proceeds to satisfy, in part, her tax liabilities for the years 1971 and 1972. Decedent repaid the loans in installments and completely discharged them by June 1978. On the basis of these facts and supported by the uncontradicted testimony of decedent's advisors, her accountant, and the bank officials involved in the loan transactions, we are convinced that there was no relationship between decedent's indebtedness and her tax-exempt obligations which *397 falls within the proscription of section 265(2). The evidence overwhelmingly establishes that decedent's only purpose in borrowing was to obtain funds to pay her Federal tax liabilities. Compare Baker v. Commissioner, supra, with Mariorenzi v. Commissioner, supra.[8] *398 *399 There is simply nothing in the record to indicate that her motivation was to create tax-exempt income or obtain a double tax benefit. The loans were specifically earmarked to pay decedent's taxes and were, in fact, used for that purpose. No portion of the loan proceeds was invested, either directly or indirectly, in tax-exempt obligations. Compare Bishop v. Commissioner, supra.Although we recognize that the loans enabled decedent to retain her previously acquired tax-exempts and thereby enjoy the tax benefits which flowed from such continued ownership, this relationship alone is not enough to invoke section 265(2). As we stated in Ball v. Commissioner, 54 T.C. 1200, 1207 (1970): [I]f this were a sufficient ground for disallowing the interest deduction, then section 265(2) would in fact be a mechanical test; i.e., the deduction would be disallowed whenever indebtedness was incurred while tax-exempts were held. As we have indicated, this is not the result that the statute was intended to achieve. To be sure, decedent could have avoided borrowing any funds by liquidating a portion of her vast Texaco holdings and using the sale proceeds to satisfy her tax liabilities. On this record, however, we do not believe that her failure to do so evinces any purposive nexus between the loans and her tax-exempt securities. The record shows that decedent twice sold Texaco stock to pay her taxes and incurred substantial capital gains taxes in the process. Under these circumstances, we think her decision to borrow in lieu of selling additional *400 stock made good business sense and was, therefore, motivated by considerations wholly unrelated to her tax-exempt holdings. Similarly, we do not believe that the prohibited purpose can be inferred in this case from decedent's failure to liquidate her tax-exempt holdings while borrowing to pay her taxes. It is clear from the testimony adduced at trial that the income tax consequences with respect to either the disposition or retention of her tax-exempt obligations played no part in decedent's decision to borrow from Continental. Indeed, the testimony indicates that no thought or consideration was even given to decedent's tax-exempt holdings in planning the loan transactions. This is not surprising when we consider the magnitude of decedent's tax liabilities in 1971 and 1972 and the fact that tax-exempt obligations comprised only a small percentage of the value of her total assets. Although respondent ignores this latter point, we believe it is a factor which militates against a finding that the indebtedness was incurred for the prohibited purpose. See Batten v. United States, 322 F. Supp. 629, 632 (E.D. Va. 1971). In this connection, we also find it significant that George Saum, *401 decedent's business consultant, testified that as a matter of prudent investment policy, decedent should have held at least 10 million dollars of tax-exempt obligations in her portfolio. Since the record shows that decedent owned far less than the minimum amount of exempt obligations deemed prudent for a person in her financial position, we think she acted as a reasonable person in retaining those obligations and borrowing to meet her cash needs. See Ball v. Commissioner, supra at 1209. This conclusion is not altered by the fact that the tax-exempts were readily marketable and could have been sold to help meet those needs. See Ball v. Commissioner, supra.
We also note that from 1971 through 1973, decedent's borrowings were far in excess of the amount of tax-exempt securities held by her. When we consider the compelling reasons which induced decedent not to sell Texaco stock during those years, it becomes clear that, in any event, liquidation of those exempt securities would not have obviated her need for borrowing large sums of money to pay her taxes. [9] While this does not necessarily negate the existence of the proscribed purpose, it does suggest that the loans were independent *402 of decedent's ownership of tax-exempt obligations. Cf. Norfolk Shipbuilding & Drydock Corp. v. United States, supra at 231-232. Respondent argues, however, that the decision in Wisconsin Cheeseman, Inc. v. United States, supra, supports his disallowance of the disputed interest deductions. We disagree. In Wisconsin Cheeseman, Inc., one of the issues concerned the deductibility of interest on short-term loans obtained to meet the taxpayer's recurrent financing needs. The taxpayer was in the seasonal business of packaging fancy cheeses for sale as Christmas gifts and incurred high costs during the last three months of the year. Short-term bank loans were obtained annually from September through early November to cover those costs and were then repaid from late November through January out of the receipts of each year's sales. Sales receipts not needed to repay the loans were used to purchase *403 tax-exempt municipal bonds and treasury bills. The treasury bills were used to meet off-season business needs while the exempt bonds were used as collateral for the bank loans. The Seventh Circuit Court of Appeals found a "sufficiently direct relationship" between the loans and the tax-exempt obligations because the tax-exempts collateralized those loans and, alternatively, because the taxpayer could reasonably have foreseen at the time of purchasing the tax-exempt obligations that loans would be required to meet its business needs. The court concluded that since the taxpayer's regular business pattern showed that it would be necessary to borrow each fall if it purchased or held exempt obligations as a long-term investment, the underlying purpose for the loans was to carry the tax-exempts. See 388 F. 2d at 422-423. The material facts herein are distinguishable from those of Wisconsin Cheeseman, Inc. In the instant case, decedent did not use her tax-exempt securities as collateral for the loans, but instead pledged 250,000 shares of Texaco stock to secure the indebtedness. Furthermore, decedent acquired most of her tax-exempt securities in 1970 in an attempt to upgrade her bond *404 portfolio. Since these acquisitions were made before the option of borrowing funds was ever contemplated by decedent or her business advisors, it is obvious that there was no foreseeable need to borrow when those tax-exempts were purchased. Cf. Handy Button Machine Co. v. Commissioner,supra at 853. Although we recognize that decedent acquired $ 400,000 of tax-exempts prior to obtaining the loan on February 15, 1973, the record shows that almost all of those tax-exempts were short-term obligations purchased in anticipation of decedent's Federal income taxes due at or about the time these securities matured and were used for the payment of such taxes. Moreover, the decision to borrow funds in February 1973, was only made in late December 1972, over six months after decedent acquired those exempt obligations. From our examination of the correspondence between decedent's advisors and officers at Continental, we believe that the necessity to incur such additional indebtedness could not have been foreseen at the time those tax-exempts were purchased. Nevertheless, even if this loan was foreseeable, we simply do not believe decedent borrowed $ 3,900,000 in February 1973, for the purpose *405 of carrying $ 350,000 of short-term tax-exempt bonds that matured one month later and were acquired to pay decedent's estimated tax liabilities. Accordingly, on the basis of the foregoing analysis, we find respondent's reliance upon Wisconsin Cheeseman, Inc., misplaced. Respondent next argues that even assuming decedent's indebtedness was not incurred to purchase or carry tax-exempt securities, it was nevertheless continued for that purpose. Respondent emphasizes that while decedent held and acquired tax-exempt securities during 1973 and 1974, she only repaid a small portion of her loan indebtedness. He contends that decedent's conscious decision to continue the indebtedness, when she had liquid assets with which to repay the loans, enabled her to maintain an investment portfolio consisting of both taxable and tax-exempt securities in an amount greater than would have been possible absent the indebtedness. Respondent submits that this is precisely the kind of conduct condemned by section 265(2). In Handy Button Machine Co. v. Commissioner, supra, this Court rejected the Commissioner's argument that section 265(2) automatically bars an interest deduction whenever a taxpayer consciously *406 chooses to incur or continue an indebtedness instead of liquidating existing tax-exempt securities. By way of contrast, respondent herein is apparently advocating that decedent has run afoul of section 265(2) merely because she failed to liquidate her taxable securities, principally Texaco stock, to repay the loans. However, since the sale of such stock would have given rise to the enormous capital gains taxes that decedent sought to avoid by initially borrowing from Continental, respondent is essentially arguing that the simultaneous existence of an indebtedness and the holding of tax-exempt securities is sufficient to trigger section 265(2). Viewed in this light, we must reject this argument as a further attempt to inject a mechanical test into this area of the law. Indeed, respondent's argument here is even less convincing than it was in Handy button in that a stronger inference of the proscribed purpose under section 265(2) can be drawn from a taxpayer's conscious decision to incur indebtedness in lieu of selling tax-exempt securities than from a decision, as in the instant case, to borrow in order to avoid the necessity of selling taxable securities and paying substantial *407 capital gains. Cf. Illinois Terminal Railroad Co. v. United States, supra.In the latter situation, the underlying policy of section 265(2) is not frustrated by allowing an interest deduction on the indebtedness because the return on such securities constitutes taxable income. Moreover, while it is true that the indebtedness enabled decedent to hold a greater amount of taxable securities than would otherwise have been possible, it had no affect on the amount of tax-exempt securities she owned. The entire record shows that the loans were obtained as an alternative to selling Texaco stock, and, therefore, we are convinced from the record that even if decedent had not borrowed from Continental, she still would have owned the same amount of tax-exempt securities in those years. In our view, this is particularly persuasive evidence of the independence of the loans from the tax-exempt obligations. Furthermore, the fact that decedent increased her holdings of tax-exempt securities during the years at issue does not require a finding that the loans were continued for the proscribed purpose. Although not determinative, we believe it is significant that none of the tax-exempts acquired *408 in 1973 and 1974 were purchased either directly or indirectly with borrowed funds. Cf. Indian Trial Trading Post, Inc. v. Commissioner, supra; Bishop v. Commissioner, supra.In addition, we note that most of those tax-exempts matured within one year and were acquired to meet decedent's tax payments. The remaining tax-exempt securities purchased during those years were primarily acquired by Stein Roe as part of the "horse race" with Continental originally established in 1970. Pursuant to its agreement with decedent, Stein Roe had complete discretion to purchase tax-exempt securities for decedent and we have found that she exercised no control over its investment decisions. Indeed, decedent was not even aware of those purchases until she received a report from Stein Roe outlining its investment activities on her behalf. Similarly, the record indicates that Stein Roe had no knowledge of decedent's loans at the time it acquired those exempt obligations. Moreover, the testimony of Alden Odt, senior partner at Stein Roe reveals that the firm purchased those obligations largely because it believed that a conservative investment policy would enable them to win the so-called "horse race" *409 with Continental. This strategy, in fact, proved successful as decedent closed the Continental "horse race" account in June 1974, and transferred the assets in that account to Stein Roe. Thus, Stein Roe clearly had its own business reason for making these purchases which was wholly unrelated to decedent's purpose for incurring or continuing the indebtedness. Cf. New Mexico Bancorporation v. Commissioner, supra.
We are not unmindful of the fact that decedent obtained more than one loan and recognize that such a fact may weigh against a taxpayer seeking to avoid the application of section 265(2). See Leslie v. Commissioner, 413 F. 2d 636, 639 (2d Cir. 1969), reversing 50 T.C. 11 (1968); Wisconsin Cheeseman, Inc. v. United States, supra.Nevertheless, based upon the totality of the circumstances herein, we are simply unable to find a sufficient relationship between decedent's borrowings and tax-exempt securities to justify the inference that she incurred or continued her indebtedness for the purpose of purchasing or carrying tax-exempts. In reaching this conclusion, we do not mean to imply that in every case where a taxpayer borrows funds to pay his taxes, section 265(2) will be inapplicable. *410 See, e.g., McDonough v. Commissioner, 577 F. 2d 234 (4th Cir. 1978), affirming a Memorandum Opinion of this Court. Another similar case may upon close analysis involve no more than mere juggling of assets creating only a "surface sanitation" of the indebtedness from the acquisition or holding of exempt obligations. See Indian Trail Trading Post, Inc. v. Commissioner, 60 T.C. at 500. This was not the case here. Accordingly, we hold that the interest decedent paid on her indebtedness in 1973 and 1974 is deductible in its entirety. In view of our holding on this issue, we need not reach the further question as to the appropriate formula for determining the amount of interest to be disallowed under section 265(2). See Rev. Proc. 72-18, 1972-1 C.B. 740. Issue 2: Loss on Section 1244 Stock
The second issue for decision is whether decedent is entitled to an ordinary loss deduction in 1974 on the worthlessness of section 1244 stock. Respondent argues that decedent failed to establish both that her stock in ISS qualified as section 1244 stock and that such stock became wholly worthless in 1974. Since we agree with respondent's second argument, it is unnecessary to decide whether decedent's *411 stock satisfied the requirements of section 1244. It is well settled that a loss may be deducted only in the year in which it is actually sustained. A loss arising from the worthlessness of stock, like other losses, must be evidenced by closed and completed transactions and fixed by identifiable events. Sec. 1.165-1(b), Income Tax Regs.; United States v. S.S. White Dental Manufacturing Co., 274 U.S. 398 (1927). A mere decline in the value of stock, short of total worthlessness, is not sufficient to establish a loss. Sec. 1.165-4(a), Income Tax Regs. The standards for a determination of worthlessness were set forth in Morton v. Commissioner, 38 B.T.A. 1270, 1278-1279 (1938), affd. 117 F. 2d 320 (7th Cir. 1940): The ultimate value of stock, and conversely its worthlessness, will depend not only on its current liquidating value, but also on what value it may acquire in the future through the foreseeable operations of the corporation. Both factors of value must be wiped out before we can definitely fix the loss. If the assets of the corporation exceed its liabilities, the stock has a liquidating value. If its assets are less than its liabilities but there is a reasonable hope and *412 expectation that the assets will exceed the liabilities of the corporation in the future, its stock, while having no liquidating value, has a potential value and can not be said to be worthless. The loss of potential value, if it exists, can be established ordinarily with satisfaction only by some "identifiable event" in the corporation's life which puts an end to such hope and expectation. Applying these standards to the facts herein, petitioners have the burden of proving that in 1974, decedent's stock in ISS ceased to have both liquidating value and potential value. On this record, petitioners clearly failed to carry their burden of proof. Although decedent's son, Robert, testified that ISS experienced severe business reversals in 1974, no financial statements or other corporate documents were introduced to establish a loss of liquidating value. Indeed, Robert even testified that ISS had sufficient assets to satisfy its liabilities at the end of 1974. Moreover, petitioners failed to prove to our satisfaction the existence of any "identifiable event" in the corporate life of ISS, such as bankruptcy, cessation of business operations, liquidation, or the appointment of a receiver, *413 which effectively destroyed the potential value of decedent's stock. Petitioners maintain, however, that the Internal Revenue Service previously examined Robert's 1974 return and allowed him a section 1244 loss for his investment in ISS. Accordingly, petitioners conclude that we should require consistency from respondent in this case and also allow decedent an ordinary loss for that year. We disagree. A similar "duty of consistency" argument was advanced by the taxpayers in Malinowski v. Commissioner, 71 T.C. 1120 (1979), and squarely rejected by this Court on procedural, factual and substantive grounds. For the same reasons expressed in Malinowski, we also reject it here. Accordingly, since petitioners failed to sustain their burden of proof on this issue, we must hold for respondent. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. The notice of deficiency was issued to Dellora A. Norris on December 1, 1977. Dellora A. Norris died on December 28, 1979, and the Estate of Dellora A. Norris, Continental Illinois National Bank and Trust Company of Chicago, George N. Gaynor and Robert C. Norris, co-executors, was substituted for Dellora A. Norris as party petitioner.↩
2. Statutory references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue.↩
3. A memorandum from Lyle Veitch to a senior loan officer at Continental dated December 28, 1972, stated as follows: Mr. Norman Nelson telephoned today to inform us that they had completed their computations on the cost and discussed extensively the advisability of borrowing funds needed to pay gift taxes due February 15, 1973. They estimate these taxes will approximate $ 4,000,000. If the cash for these taxes was raised through the sale of stock, it would result in a capital gains tax of approximately $ 1,000,000. They had originally intended borrowing only the $ 1,000,000 and I had suggested they consider borrowing the original $ 4,000,000 and thereby possibly avoid the $ 1,000,000 resulting capital gains tax. I told Mr. Nelson that we had discussed the desirability on our part of collateralizing the present and future loans. He fully understands this and assures us that this is no problem. Therefore, you can probably plan on their requesting a loan of approximately $ 4,000,000, funds to be credited to her checking account on February 15, 1973. I understand that her present checking account balance is $ 1,000,000 and Nelson assures me that these funds will be left there over the year end, to be used substantially for income tax payments due January 15, 1973.↩
4. No tax-exempt securities were sold in either 1973 or 1974.↩
5. The proceeds received on the maturity of the Toledo, Ohio, obligations were reinvested in the New York, New York, exempt obligations.↩
6. None of the taxable securities sold consisted of Texaco stock.↩
7. Includes decedent's taxable securities, tax-exempt securities, cash, notes, commercial property, personal residence, and furnishings therein.↩
8. In Baker v. Commissioner, 75 T.C. 166 (1980), the taxpayer obtained interest-free loans from his corporation over a three-year period and used the borrowed funds to pay estimated taxes. During those same years, he also invested in tax-exempt obligations. Relying on Dean v. Commissioner, 35 T.C. 1083 (1961), we held that the taxpayer did not realize taxable income based on his use or enjoyment of the tax-free loans. In reaching this result, however, we further held that section 265(2) was not applicable on the facts because the loans were used to make estimated tax payments and there was no showing of any nexus between such indebtedness and the tax-exempt securities. Section 265(2) was held applicable, however, on the facts in Mariorenzi v. Commissioner, 490 F. 2d 92 (1st Cir. 1974), affg. a Memorandum Opinion of this Court. In that case, the taxpayer, at a time when he owned tax-exempt obligations, obtained a mortgage loan of $ 37,200 on a personal residence for which he had previously paid for in full. Within the next five months, he purchased taxable and tax-exempt securities in a similar amount. Responding to the Commissioner's disallowance of the claimed interest deduction on the loan, the taxpayer argued that he incurred the indebtedness to make estimated tax payments. This Court rejected such contentions, however, noting that the taxpayer had more than enough cash on hand to meet his tax obligations without borrowing. We further emphasized that the taxpayer offered no evidence showing that the loan proceeds were either earmarked or used to pay such taxes. Accordingly, we held that since the loan had no purpose other than to enable the taxpayer to acquire and hold tax-exempt obligations, section 265(2)↩ prohibited the interest deduction.
9. The record indicates that decedent did not have sufficient funds on deposit in her checking account to discharge her tax liabilities for 1971 and 1972. Moreover, she, in fact, used such funds as well as the dividends received on taxable securities to pay the bulk of her taxes for those years.↩